(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BROWN, GOVERNOR OF CALIFORNIA, ET AL. *v.* ENTERTAINMENT MERCHANTS ASSOCIATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1448.   Argued November 2, 2010—Decided June 27, 2011

Respondents, representing the video-game and software industries, filed a preenforcement challenge to a California law that restricts the sale or rental of violent video games to minors. The Federal District Court concluded that the Act violated the First Amendment and permanently enjoined its enforcement. The Ninth Circuit affirmed.

*Held:* The Act does not comport with the First Amendment. Pp. 2–18.

   (a) Video games qualify for First Amendment protection. Like protected books, plays, and movies, they communicate ideas through familiar literary devices and features distinctive to the medium. And "the basic principles of freedom of speech . . . do not vary" with a new and different communication medium. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 503. The most basic principle—that government lacks the power to restrict expression because of its message, ideas, subject matter, or content, *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573—is subject to a few limited exceptions for historically unprotected speech, such as obscenity, incitement, and fighting words. But a legislature cannot create new categories of unprotected speech simply by weighing the value of a particular category against its social costs and then punishing it if it fails the test. See *United States* v. *Stevens*, 559 U. S. ___, ___. Unlike the New York law upheld in *Ginsberg* v. *New York*, 390 U. S. 629, California's Act does not adjust the boundaries of an existing category of unprotected speech to ensure that a definition designed for adults is not uncritically applied to children. Instead, the State wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children. That is unprecedented and

mistaken.  This country has no tradition of specially restricting children's access to depictions of violence.  And California's claim that "interactive" video games present special problems, in that the player participates in the violent action on screen and determines its outcome, is unpersuasive.  Pp. 2–11.

(b) Because the Act imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny, *i.e.,* it is justified by a compelling government interest and is narrowly drawn to serve that interest.  *R. A. V.* v. *St. Paul*, 505 U. S. 377, 395.  California cannot meet that standard.  Psychological studies purporting to show a connection between exposure to violent video games and harmful effects on children do not prove that such exposure causes minors to act aggressively.  Any demonstrated effects are both small and indistinguishable from effects produced by other media.  Since California has declined to restrict those other media, *e.g.,* Saturday morning cartoons, its video-game regulation is wildly underinclusive, raising serious doubts about whether the State is pursuing the interest it invokes or is instead disfavoring a particular speaker or viewpoint.  California also cannot show that the Act's restrictions meet the alleged substantial need of parents who wish to restrict their children's access to violent videos.  The video-game industry's voluntary rating system already accomplishes that to a large extent.  Moreover, as a means of assisting parents the Act is greatly overinclusive, since not all of the children who are prohibited from purchasing violent video games have parents who disapprove of their doing so.  The Act cannot satisfy strict scrutiny. Pp. 11–18.

556 F. 3d 950, affirmed.

SCALIA, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.  ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., joined.  THOMAS, J., and BREYER, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–1448

EDMUND G. BROWN, JR., GOVERNOR OF CAL-IFORNIA, ET AL., PETITIONERS *v.* ENTERTAIN-MENT MERCHANTS ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 27, 2011]

JUSTICE SCALIA delivered the opinion of the Court.

We consider whether a California law imposing restrictions on violent video games comports with the First Amendment.

## I

California Assembly Bill 1179 (2005), Cal. Civ. Code Ann. §§1746–1746.5 (West 2009) (Act), prohibits the sale or rental of "violent video games" to minors, and requires their packaging to be labeled "18."  The Act covers games "in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted" in a manner that "[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors," that is "patently offensive to prevailing standards in the community as to what is suitable for minors," and that "causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors."  §1746(d)(1)(A).  Violation of the Act is punishable by a civil fine of up to $1,000.  §1746.3.

Respondents, representing the video-game and software industries, brought a preenforcement challenge to the Act in the United States District Court for the Northern District of California. That court concluded that the Act violated the First Amendment and permanently enjoined its enforcement. *Video Software Dealers Assn.* v. *Schwarzenegger*, No. C–05–04188 RMW (2007), App. to Pet. for Cert. 39a. The Court of Appeals affirmed, *Video Software Dealers Assn.* v. *Schwarzenegger*, 556 F. 3d 950 (CA9 2009), and we granted certiorari, 559 U. S. ___ (2010).

## II

California correctly acknowledges that video games qualify for First Amendment protection. The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try. "Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine." *Winters* v. *New York*, 333 U. S. 507, 510 (1948). Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection. Under our Constitution, "esthetic and moral judgments about art and literature . . . are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 818 (2000). And whatever the challenges of applying the Constitution to ever-advancing technology, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary" when a new and different medium for communica-

tion appears. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 503 (1952).

The most basic of those principles is this: "[A]s a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). There are of course exceptions. "'From 1791 to the present,' . . . the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these traditional limitations.'" *United States* v. *Stevens*, 559 U. S. ___, ___ (2010) (slip op., at 5) (quoting *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382–383 (1992)). These limited areas—such as obscenity, *Roth* v. *United States*, 354 U. S. 476, 483 (1957), incitement, *Brandenburg* v. *Ohio*, 395 U. S. 444, 447–449 (1969) *(per curiam)*, and fighting words, *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572 (1942)—represent "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *id.*, at 571–572.

Last Term, in *Stevens*, we held that new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated. *Stevens* concerned a federal statute purporting to criminalize the creation, sale, or possession of certain depictions of animal cruelty. See 18 U. S. C. §48 (amended 2010). The statute covered depictions "in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed" if that harm to the animal was illegal where the "the creation, sale, or possession t[ook] place," §48(c)(1). A saving clause largely borrowed from our obscenity jurisprudence, see *Miller* v. *California*, 413 U. S. 15, 24 (1973), exempted depictions with "serious religious, political, scientific, educational, journalistic,

historical, or artistic value," §48(b). We held that statute to be an impermissible content-based restriction on speech. There was no American tradition of forbidding the *depiction of* animal cruelty—though States have long had laws against *committing* it.

The Government argued in *Stevens* that lack of a historical warrant did not matter; that it could create new categories of unprotected speech by applying a "simple balancing test" that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test. *Stevens*, 559 U. S., at ___ (slip op., at 7). We emphatically rejected that "startling and dangerous" proposition. *Ibid.* "Maybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Id.*, at ___ (slip op., at 9). But without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the "judgment [of] the American people," embodied in the First Amendment, "that the benefits of its restrictions on the Government outweigh the costs." *Id.*, at ___ (slip op., at 7).

That holding controls this case.[1] As in *Stevens*, Califor-

--------------

[1] JUSTICE ALITO distinguishes *Stevens* on several grounds that seem to us ill founded. He suggests, *post*, at 10 (opinion concurring in judgment), that *Stevens* did not apply strict scrutiny. If that is so (and we doubt it), it would make this an *a fortiori* case. He says, *post*, at 9, 10, that the California Act punishes the sale or rental rather than the "creation" or "possession" of violent depictions. That distinction appears nowhere in *Stevens* itself, and for good reason: It would make permissible the prohibition of printing or selling books—though not the writing of them. Whether government regulation applies to creating, distributing, or consuming speech makes no difference. And finally, JUSTICE ALITO points out, *post*, at 10, that *Stevens* "left open the possibility that a more narrowly drawn statute" would be constitutional. True, but entirely irrelevant. *Stevens* said, 559 U. S., at ___ (slip op., at

nia has tried to make violent-speech regulation look like obscenity regulation by appending a saving clause required for the latter. That does not suffice. Our cases have been clear that the obscenity exception to the First Amendment does not cover whatever a legislature finds shocking, but only depictions of "sexual conduct," *Miller*, *supra,* at 24. See also *Cohen* v. *California*, 403 U. S. 15, 20 (1971); *Roth*, *supra,* at 487, and n. 20.

*Stevens* was not the first time we have encountered and rejected a State's attempt to shoehorn speech about violence into obscenity. In *Winters*, we considered a New York criminal statute "forbid[ding] the massing of stories of bloodshed and lust in such a way as to incite to crime against the person," 333 U. S., at 514. The New York Court of Appeals upheld the provision as a law against obscenity. "[T]here can be no more precise test of written indecency or obscenity," it said, "than the continuing and changeable experience of the community as to what types of books are likely to bring about the corruption of public morals or other analogous injury to the public order." *Id.*, at 514 (internal quotation marks omitted). That is of course the same expansive view of governmental power to abridge the freedom of speech based on interest-balancing that we rejected in *Stevens*. Our opinion in *Winters*, which concluded that the New York statute failed a heightened vagueness standard applicable to restrictions upon speech entitled to First Amendment protection, 333 U. S., at 517– 519, made clear that violence is not part of the obscenity that the Constitution permits to be regulated. The speech reached by the statute contained "no indecency or obscenity in any sense heretofore known to the law." *Id.*, at 519.

_____

19), that the "crush-video" statute at issue there might pass muster if it were limited to videos of acts of animal cruelty that violated the law where the acts were performed. There is no contention that any of the virtual characters depicted in the imaginative videos at issue here are criminally liable.

Because speech about violence is not obscene, it is of no consequence that California's statute mimics the New York statute regulating obscenity-for-minors that we upheld in *Ginsberg* v. *New York*, 390 U. S. 629 (1968). That case approved a prohibition on the sale to minors of *sexual* material that would be obscene from the perspective of a child.[2] We held that the legislature could "adjus[t] the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests . . .' of . . . minors. " *Id.*, at 638 (quoting *Mishkin* v. *New York*, 383 U. S. 502, 509 (1966)). And because "obscenity is not protected expression," the New York statute could be sustained so long as the legislature's judgment that the proscribed materials were harmful to children "was not irrational." 390 U. S., at 641.

The California Act is something else entirely. It does not adjust the boundaries of an existing category of unprotected speech to ensure that a definition designed for adults is not uncritically applied to children. California does not argue that it is empowered to prohibit selling offensively violent works *to adults*—and it is wise not to, since that is but a hair's breadth from the argument rejected in *Stevens*. Instead, it wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children.

That is unprecedented and mistaken. "[M]inors are

---

[2] The statute in *Ginsberg* restricted the sale of certain depictions of "nudity, sexual conduct, sexual excitement, or sado-masochistic abuse," that were "'[h]armful to minors.'" A depiction was harmful to minors if it:

"(i) predominantly appeals to the prurient, shameful or morbid interests of minors, and

"(ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

"(iii) is utterly without redeeming social importance for minors." 390 U. S., at 646 (Appendix A to opinion of the Court) (quoting N. Y. Penal Law §484–h(1)(f)).

entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 212–213 (1975) (citation omitted). No doubt a State possesses legitimate power to protect children from harm, *Ginsberg, supra*, at 640–641; *Prince* v. *Massachusetts*, 321 U. S. 158, 165 (1944), but that does not include a free-floating power to restrict the ideas to which children may be exposed. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, *supra,* at 213–214.[3]

————————

[3] JUSTICE THOMAS ignores the holding of *Erznoznik*, and denies that persons under 18 have any constitutional right to speak or be spoken to without their parents' consent. He cites no case, state or federal, supporting this view, and to our knowledge there is none. Most of his dissent is devoted to the proposition that parents have traditionally had the power to control what their children hear and say. This is true enough. And it perhaps follows from this that the state has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend. But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*. The latter would mean, for example, that it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors. And what is good for First Amendment rights of speech must be good for First Amendment rights of religion as well: It could be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent. Our point is not, as JUSTICE THOMAS believes, *post*, at 16, n. 2, merely that such laws are "undesirable." They are obviously an infringement upon the religious freedom of young people and those who wish to proselytize young people. Such laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only

California's argument would fare better if there were a longstanding tradition in this country of specially restricting children's access to depictions of violence, but there is none. Certainly the *books* we give children to read—or read to them when they are younger—contain no shortage of gore. Grimm's Fairy Tales, for example, are grim indeed. As her just deserts for trying to poison Snow White, the wicked queen is made to dance in red hot slippers "till she fell dead on the floor, a sad example of envy and jealousy." The Complete Brothers Grimm Fairy Tales 198 (2006 ed.). Cinderella's evil stepsisters have their eyes pecked out by doves. *Id.*, at 95. And Hansel and Gretel (children!) kill their captor by baking her in an oven. *Id.*, at 54.

High-school reading lists are full of similar fare. Homer's Odysseus blinds Polyphemus the Cyclops by grinding out his eye with a heated stake. The Odyssey of Homer, Book IX, p. 125 (S. Butcher & A. Lang transls. 1909) ("Even so did we seize the fiery-pointed brand and whirled it round in his eye, and the blood flowed about the heated bar. And the breath of the flame singed his eyelids and brows all about, as the ball of the eye burnt away, and the roots thereof crackled in the flame"). In the Inferno, Dante and Virgil watch corrupt politicians struggle to stay submerged beneath a lake of boiling pitch, lest they be skewered by devils above the surface. Canto XXI, pp. 187–189 (A. Mandelbaum transl. Bantam Classic ed. 1982). And Golding's Lord of the Flies recounts how a schoolboy called Piggy is savagely murdered *by other*

––––––––––

to a parental veto. In the absence of any precedent for state control, uninvited by the parents, over a child's speech and religion (JUSTICE THOMAS cites none), and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional. This argument is not, as JUSTICE THOMAS asserts, "circular," *ibid.* It is the absence of any historical warrant or compelling justification for such restrictions, not our *ipse dixit*, that renders them invalid.

*children* while marooned on an island. W. Golding, Lord of the Flies 208–209 (1997 ed.).[4]

This is not to say that minors' consumption of violent entertainment has never encountered resistance. In the 1800's, dime novels depicting crime and "penny dreadfuls" (named for their price and content) were blamed in some quarters for juvenile delinquency. See Brief for Cato Institute as *Amicus Curiae* 6–7. When motion pictures came along, they became the villains instead. "The days when the police looked upon dime novels as the most dangerous of textbooks in the school for crime are drawing to a close. . . . They say that the moving picture machine . . . tends even more than did the dime novel to turn the thoughts of the easily influenced to paths which sometimes lead to prison." Moving Pictures as Helps to Crime, N. Y. Times, Feb. 21, 1909, quoted in Brief for Cato Institute, at 8. For a time, our Court did permit broad censorship of movies because of their capacity to be "used for evil," see *Mutual Film Corp.* v. *Industrial Comm'n of Ohio*, 236 U. S. 230, 242 (1915), but we eventually reversed course, *Joseph Burstyn, Inc.*, 343 U. S., at 502; see also *Erznoznik*, *supra,* at 212–214 (invalidating a drive-in

———————

[4] JUSTICE ALITO accuses us of pronouncing that playing violent video games "is not different in 'kind'" from reading violent literature. *Post*, at 2. Well of course it is different in kind, but not in a way that causes the provision and viewing of violent video games, unlike the provision and reading of books, not to be expressive activity and hence not to enjoy First Amendment protection. Reading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not *constitutional* ones. Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny—a question to which we devote our attention in Part III, *infra.* Even if we can see in them "nothing of any possible value to society . . . , they are as much entitled to the protection of free speech as the best of literature." *Winters* v. *New York*, 333 U. S. 507, 510 (1948).

movies restriction designed to protect children).  Radio dramas were next, and then came comic books.  Brief for Cato Institute, at 10–11.  Many in the late 1940's and early 1950's blamed comic books for fostering a "preoccupation with violence and horror" among the young, leading to a rising juvenile crime rate.  See Note, Regulation of Comic Books, 68 Harv. L. Rev. 489, 490 (1955).  But efforts to convince Congress to restrict comic books failed.  Brief for Comic Book Legal Defense Fund as *Amicus Curiae* 11–15.[5]  And, of course, after comic books came television and music lyrics.

California claims that video games present special problems because they are "interactive," in that the player participates in the violent action on screen and determines its outcome.  The latter feature is nothing new: Since at least the publication of The Adventures of You: Sugarcane Island in 1969, young readers of choose-your-own-adventure stories have been able to make decisions that determine the plot by following instructions about which page to turn to.  Cf. *Interactive Digital Software Assn.* v. *St. Louis County,* 329 F. 3d 954, 957–958 (CA8 2003).  As for the argument that video games enable participation in the violent action, that seems to us more a matter of degree than of kind.  As Judge Posner has observed, all

---

[5] The crusade against comic books was led by a psychiatrist, Frederic Wertham, who told the Senate Judiciary Committee that "as long as the crime comic books industry exists in its present forms there are no secure homes."  Juvenile Delinquency (Comic Books): Hearings before the Subcommittee to Investigate Juvenile Delinquency, 83d Cong., 2d Sess., 84 (1954).  Wertham's objections extended even to Superman comics, which he described as "particularly injurious to the ethical development of children."  *Id.*, at 86.  Wertham's crusade did convince the New York Legislature to pass a ban on the sale of certain comic books to minors, but it was vetoed by Governor Thomas Dewey on the ground that it was unconstitutional given our opinion in *Winters, supra.*  See *People* v. *Bookcase, Inc.*, 14 N. Y. 2d 409, 412–413, 201 N. E. 2d 14, 15–16 (1964).

literature is interactive. "[T]he better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *American Amusement Machine Assn.* v. *Kendrick*, 244 F. 3d 572, 577 (CA7 2001) (striking down a similar restriction on violent video games).

JUSTICE ALITO has done considerable independent research to identify, see *post*, at 14–15, nn. 13–18, video games in which "the violence is astounding," *post*, at 14. "Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into little pieces. . . . Blood gushes, splatters, and pools." *Ibid.* JUSTICE ALITO recounts all these disgusting video games in order to disgust us—but disgust is not a valid basis for restricting expression. And the same is true of JUSTICE ALITO's description, *post*, at 14–15, of those video games he has discovered that have a racial or ethnic motive for their violence—"'ethnic cleansing' [of] . . . African Americans, Latinos, or Jews." To what end does he relate this? Does it somehow increase the "aggressiveness" that California wishes to suppress? Who knows? But it does arouse the reader's ire, and the reader's desire to put an end to this horrible message. Thus, ironically, JUSTICE ALITO's argument highlights the precise danger posed by the California Act: that the *ideas* expressed by speech—whether it be violence, or gore, or racism—and not its objective effects, may be the real reason for governmental proscription.

## III

Because the Act imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest. *R. A. V.*, 505 U. S., at

395. The State must specifically identify an "actual problem" in need of solving, *Playboy*, 529 U. S., at 822–823, and the curtailment of free speech must be actually necessary to the solution, see *R. A. V.*, *supra,* at 395. That is a demanding standard. "It is rare that a regulation restricting speech because of its content will ever be permissible." *Playboy*, *supra,* at 818.

California cannot meet that standard. At the outset, it acknowledges that it cannot show a direct causal link between violent video games and harm to minors. Rather, relying upon our decision in *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622 (1994), the State claims that it need not produce such proof because the legislature can make a predictive judgment that such a link exists, based on competing psychological studies. But reliance on *Turner Broadcasting* is misplaced. That decision applied *intermediate scrutiny* to a content-neutral regulation. *Id.,* at 661–662. California's burden is much higher, and because it bears the risk of uncertainty, see *Playboy*, *supra,* at 816–817, ambiguous proof will not suffice.

The State's evidence is not compelling. California relies primarily on the research of Dr. Craig Anderson and a few other research psychologists whose studies purport to show a connection between exposure to violent video games and harmful effects on children. These studies have been rejected by every court to consider them,[6] and with good reason: They do not prove that violent video

_____

[6] See *Video Software Dealers Assn.* v. *Schwarzenegger,* 556 F. 3d 950, 963–964 (CA9 2009); *Interactive Digital Software Assn.* v. *St. Louis County,* 329 F. 3d 954 (CA8 2003); *American Amusement Machine Assn.* v. *Kendrick*, 244 F. 3d 572, 578–579 (CA7 2001); *Entertainment Software Assn.* v. *Foti*, 451 F. Supp. 2d 823, 832–833 (MD La. 2006); *Entertainment Software Assn.* v. *Hatch*, 443 F. Supp. 2d 1065, 1070 (Minn. 2006), aff'd, 519 F. 3d 768 (CA8 2008); *Entertainment Software Assn.* v. *Granholm*, 426 F. Supp. 2d 646, 653 (ED Mich. 2006); *Entertainment Software Assn.* v. *Blagojevich*, 404 F. Supp. 2d 1051, 1063 (ND Ill. 2005), aff'd, 469 F. 3d 641 (CA7 2006).

games *cause* minors to *act* aggressively (which would at least be a beginning). Instead, "[n]early all of the research is based on correlation, not evidence of causation, and most of the studies suffer from significant, admitted flaws in methodology." *Video Software Dealers Assn.* 556 F. 3d, at 964. They show at best some correlation between exposure to violent entertainment and minuscule real-world effects, such as children's feeling more aggressive or making louder noises in the few minutes after playing a violent game than after playing a nonviolent game.[7]

Even taking for granted Dr. Anderson's conclusions that violent video games produce some effect on children's feelings of aggression, those effects are both small and indistinguishable from effects produced by other media. In his testimony in a similar lawsuit, Dr. Anderson admitted that the "effect sizes" of children's exposure to violent video games are "about the same" as that produced by their exposure to violence on television. App. 1263. And he admits that the *same* effects have been found when children watch cartoons starring Bugs Bunny or the Road Runner, *id.,* at 1304, or when they play video games like Sonic the Hedgehog that are rated "E" (appropriate for all ages), *id.,* at 1270, or even when they "vie[w] a picture of a gun," *id.,* at 1315–1316.[8]

––––––––––

[7] One study, for example, found that children who had just finished playing violent video games were more likely to fill in the blank letter in "explo_e" with a "d" (so that it reads "explode") than with an "r" ("explore"). App. 496, 506 (internal quotation marks omitted). The prevention of this phenomenon, which might have been anticipated with common sense, is not a compelling state interest.

[8] JUSTICE ALITO is mistaken in thinking that we fail to take account of "new and rapidly evolving technology," *post*, at 1. The studies in question pertain to that new and rapidly evolving technology, and fail to show, with the degree of certitude that strict scrutiny requires, that this subject-matter restriction on speech is justified. Nor is JUSTICE ALITO correct in attributing to us the view that "violent video games really present no serious problem." *Post*, at 2. Perhaps they do present

Of course, California has (wisely) declined to restrict Saturday morning cartoons, the sale of games rated for young children, or the distribution of pictures of guns. The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it. Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint. See *City of Ladue* v. *Gilleo*, 512 U. S. 43, 51 (1994); *Florida Star* v. *B. J. F.*, 491 U. S. 524, 540 (1989). Here, California has singled out the purveyors of video games for disfavored treatment—at least when compared to booksellers, cartoonists, and movie producers—and has given no persuasive reason why.

The Act is also seriously underinclusive in another respect—and a respect that renders irrelevant the contentions of the concurrence and the dissents that video games

_____

a problem, and perhaps none of us would allow our own children to play them. But there are all sorts of "problems"—some of them surely more serious than this one—that cannot be addressed by governmental restriction of free expression: for example, the problem of encouraging anti-Semitism (*National Socialist Party of America* v. *Skokie*, 432 U. S. 43 (1977) *(per curiam)*), the problem of spreading a political philosophy hostile to the Constitution (*Noto* v. *United States*, 367 U. S. 290 (1961)), or the problem of encouraging disrespect for the Nation's flag (*Texas* v. *Johnson*, 491 U. S. 397 (1989)).

JUSTICE BREYER would hold that California has satisfied strict scrutiny based upon his own research into the issue of the harmfulness of violent video games. See *post*, at 20–35 (Appendixes to dissenting opinion) (listing competing academic articles discussing the harmfulness *vel non* of violent video games). The vast preponderance of this research is outside the record—and in any event we do not see how it could lead to JUSTICE BREYER's conclusion, since he admits he cannot say whether the studies on his side are right or wrong. *Post*, at 15. Similarly, JUSTICE ALITO says he is not "sure" whether there are any constitutionally dispositive differences between video games and other media. *Post*, at 2. If that is so, then strict scrutiny plainly has not been satisfied.

are qualitatively different from other portrayals of violence. The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK. And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices. That is not how one addresses a serious social problem.

California claims that the Act is justified in aid of parental authority: By requiring that the purchase of violent video games can be made only by adults, the Act ensures that parents can decide what games are appropriate. At the outset, we note our doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority. Accepting that position would largely vitiate the rule that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Erznoznik*, 422 U. S., at 212–213.

But leaving that aside, California cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so. The video-game industry has in place a voluntary rating system designed to inform consumers about the content of games. The system, implemented by the Entertainment Software Rating Board (ESRB), assigns age-specific ratings to each video game submitted: EC (Early Childhood); E (Everyone); E10+ (Everyone 10 and older); T (Teens); M (17 and older); and AO (Adults Only—18 and older). App. 86. The Video Software Dealers Association encourages retailers to prominently display information about the ESRB system in their stores; to refrain from renting or selling adults-only games to minors; and to rent or sell "M" rated games

to minors only with parental consent.  *Id.,* at 47.  In 2009, the Federal Trade Commission (FTC) found that, as a result of this system, "the video game industry outpaces the movie and music industries" in "(1) restricting target-marketing of mature-rated products to children; (2) clearly and prominently disclosing rating information; and (3) restricting children's access to mature-rated products at retail."  FTC, Report to Congress, Marketing Violent Entertainment to Children 30 (Dec. 2009), online at http://www.ftc.gov/os/2009/12/P994511violrententertainment.pdf (as visited June 24, 2011, and available in Clerk of Court's case file) (FTC Report).  This system does much to ensure that minors cannot purchase seriously violent games on their own, and that parents who care about the matter can readily evaluate the games their children bring home.  Filling the remaining modest gap in concerned-parents' control can hardly be a compelling state interest.[9]

And finally, the Act's purported aid to parental authority is vastly overinclusive.  Not all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games.  While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want.  This is not the narrow tailoring to "assisting parents" that

—————

[9] JUSTICE BREYER concludes that the remaining gap is compelling because, according to the FTC's report, some "20% of those under 17 are still able to buy M-rated games."  *Post*, at 18 (citing FTC Report 28).  But some gap in compliance is unavoidable.  The sale of alcohol to minors, for example, has long been illegal, but a 2005 study suggests that about 18% of retailers still sell alcohol to those under the drinking age.  Brief for State of Rhode Island et al. as *Amici Curiae* 18.  Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced.

restriction of First Amendment rights requires.

\*   \*   \*

California's effort to regulate violent video games is the latest episode in a long series of failed attempts to censor violent entertainment for minors. While we have pointed out above that some of the evidence brought forward to support the harmfulness of video games is unpersuasive, we do not mean to demean or disparage the concerns that underlie the attempt to regulate them—concerns that may and doubtless do prompt a good deal of parental oversight. We have no business passing judgment on the view of the California Legislature that violent video games (or, for that matter, any other forms of speech) corrupt the young or harm their moral development. Our task is only to say whether or not such works constitute a "well-defined and narrowly limited clas[s] of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," *Chaplinsky*, 315 U. S., at 571–572 (the answer plainly is no); and if not, whether the regulation of such works is justified by that high degree of necessity we have described as a compelling state interest (it is not). Even where the protection of children is the object, the constitutional limits on governmental action apply.

California's legislation straddles the fence between (1) addressing a serious social problem and (2) helping concerned parents control their children. Both ends are legitimate, but when they affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993). As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental or avuncular

veto.  And as a means of assisting concerned parents it is seriously overinclusive because it abridges the First Amendment rights of young people whose parents (and aunts and uncles) think violent video games are a harmless pastime.  And the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other. Legislation such as this, which is neither fish nor fowl, cannot survive strict scrutiny.

We affirm the judgment below.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–1448

EDMUND G. BROWN, JR., GOVERNOR OF CAL-
IFORNIA, ET AL., PETITIONERS *v.* ENTERTAIN-
MENT MERCHANTS ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2011]

JUSTICE ALITO, with whom THE CHIEF JUSTICE joins, concurring in the judgment.

The California statute that is before us in this case represents a pioneering effort to address what the state legislature and others regard as a potentially serious social problem: the effect of exceptionally violent video games on impressionable minors, who often spend countless hours immersed in the alternative worlds that these games create. Although the California statute is well intentioned, its terms are not framed with the precision that the Constitution demands, and I therefore agree with the Court that this particular law cannot be sustained.

I disagree, however, with the approach taken in the Court's opinion. In considering the application of unchanging constitutional principles to new and rapidly evolving technology, this Court should proceed with caution. We should make every effort to understand the new technology. We should take into account the possibility that developing technology may have important societal implications that will become apparent only with time. We should not jump to the conclusion that new technology is fundamentally the same as some older thing with which we are familiar. And we should not hastily dismiss the judgment of legislators, who may be in a better position

than we are to assess the implications of new technology. The opinion of the Court exhibits none of this caution.

In the view of the Court, all those concerned about the effects of violent video games—federal and state legislators, educators, social scientists, and parents—are unduly fearful, for violent video games really present no serious problem. See *ante*, at 10–13, 15–16. Spending hour upon hour controlling the actions of a character who guns down scores of innocent victims is not different in "kind" from reading a description of violence in a work of literature. See *ante*, at 10–11.

The Court is sure of this; I am not. There are reasons to suspect that the experience of playing violent video games just might be very different from reading a book, listening to the radio, or watching a movie or a television show.

I

Respondents in this case, representing the video-game industry, ask us to strike down the California law on two grounds: The broad ground adopted by the Court and the narrower ground that the law's definition of "violent video game," see Cal. Civ. Code Ann. §1746(d)(1)(A) (West 2009), is impermissibly vague. See Brief for Respondents 23–61. Because I agree with the latter argument, I see no need to reach the broader First Amendment issues addressed by the Court.[1]

A

Due process requires that laws give people of ordinary intelligence fair notice of what is prohibited. *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972). The lack of such notice in a law that regulates expression "raises

_____

[1] It is well established that a judgment may be affirmed on an alternative ground that was properly raised but not addressed by the lower court. *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 478, n. 20 (1979).

special First Amendment concerns because of its obvious chilling effect on free speech." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 871–872 (1997). Vague laws force potential speakers to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett* v. *Bullitt*, 377 U. S. 360, 372 (1964) (quoting *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958)). While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward* v. *Rock Against Racism*, 491 U. S. 781, 794 (1989), "government may regulate in the area" of First Amendment freedoms "only with narrow specificity," *NAACP* v. *Button*, 371 U. S. 415, 433 (1963); see also *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 499 (1982). These principles apply to laws that regulate expression for the purpose of protecting children. See *Interstate Circuit, Inc.* v. *Dallas*, 390 U. S. 676, 689 (1968).

Here, the California law does not define "violent video games" with the "narrow specificity" that the Constitution demands. In an effort to avoid First Amendment problems, the California Legislature modeled its violent video game statute on the New York law that this Court upheld in *Ginsberg* v. *New York*, 390 U. S. 629 (1968)—a law that prohibited the sale of certain sexually related materials to minors, see *id.*, at 631–633. But the California Legislature departed from the *Ginsberg* model in an important respect, and the legislature overlooked important differences between the materials falling within the scope of the two statutes.

### B

The law at issue in *Ginsberg* prohibited the sale to minors of materials that were deemed "harmful to minors," and the law defined "harmful to minors" simply by adding the words "for minors" to each element of the

definition of obscenity set out in what were then the Court's leading obscenity decisions, see *Roth* v. *United States*, 354 U. S. 476 (1957), and *Book Named "John Cleland's Memoirs of a Woman of Pleasure"* v. *Attorney General of Mass.*, 383 U. S. 413 (1966).

Seeking to bring its violent video game law within the protection of *Ginsberg*, the California Legislature began with the obscenity test adopted in *Miller* v. *California*, 413 U. S. 15 (1973), a decision that revised the obscenity tests previously set out in *Roth* and *Memoirs*. The legislature then made certain modifications to accommodate the aim of the violent video game law.

Under *Miller*, an obscenity statute must contain a threshold limitation that restricts the statute's scope to specifically described "hard core" materials. See 413 U. S., at 23–25, 27. Materials that fall within this "hard core" category may be deemed to be obscene if three additional requirements are met:

> (1) an "average person, applying contemporary community standards [must] find . . . the work, taken as a whole, appeals to the prurient interest";
> (2) "the work [must] depic[t] or describ[e], in a patently offensive way, sexual conduct specifically defined by the applicable state law; and"
> (3) "the work, taken as a whole, [must] lac[k] serious literary, artistic, political, or scientific value." *Id.*, at 24 (internal quotation marks omitted).

Adapting these standards, the California law imposes the following threshold limitation: "[T]he range of options available to a player [must] includ[e] killing, maiming, dismembering, or sexually assaulting an image of a human being." §1746(d)(1). Any video game that meets this threshold test is subject to the law's restrictions if it also satisfies three further requirements:

> "(i) A reasonable person, considering the game as a

whole, would find [the game] appeals to a deviant or morbid interest of minors.

"(ii) It is patently offensive to prevailing standards in the community as to what is suitable for minors.

"(iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors." §1746(d)(1)(A).[2]

## C

The first important difference between the *Ginsberg* law and the California violent video game statute concerns their respective threshold requirements. As noted, the *Ginsberg* law built upon the test for adult obscenity, and the current adult obscenity test, which was set out in *Miller,* requires an obscenity statute to contain a threshold limitation that restricts the statute's coverage to specifically defined "hard core" depictions. See 413 U. S., at 23–25, 27. The *Miller* Court gave as an example a statute that applies to only "[p]atently offensive representations or descriptions of ultimate sexual acts," "masturbation, excretory functions, and lewd exhibition of the genitals." *Id.*, at 25. The *Miller* Court clearly viewed this threshold limitation as serving a vital notice function. "We are satisfied," the Court wrote, "that these specific prerequisites will provide fair notice to a dealer in such materials that his public and commercial activities may bring prosecution." *Id.*, at 27; see also *Reno, supra,* at 873 (observing that *Miller*'s threshold limitation "reduces the vagueness

---

[2] Under the California law, a game that meets the threshold requirement set out in text also qualifies as "violent" if it "[e]nables the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel, or depraved in that it involves torture or serious physical abuse to the victim." §1746(d)(1)(B). In the Court of Appeals, California conceded that this alternative definition is unconstitutional, 556 F. 3d 950, 954, n. 5 (CA9 2009), and therefore only the requirements set out in text are now before us.

inherent in the open-ended term 'patently offensive'").[3]

By contrast, the threshold requirement of the California law does not perform the narrowing function served by the limitation in *Miller*. At least when *Miller* was decided, depictions of "hard core" sexual conduct were not a common feature of mainstream entertainment. But nothing similar can be said about much of the conduct covered by the California law. It provides that a video game cannot qualify as "violent" unless "the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being." §1746(d)(1).

For better or worse, our society has long regarded many depictions of killing and maiming[4] as suitable features of popular entertainment, including entertainment that is widely available to minors. The California law's threshold requirement would more closely resemble the limitation in *Miller* if it targeted a narrower class of graphic depictions.

Because of this feature of the California law's threshold test, the work of providing fair notice is left in large part to the three requirements that follow, but those elements are also not up to the task. In drafting the violent video game law, the California Legislature could have made its own judgment regarding the kind and degree of violence that is acceptable in games played by minors (or by minors in particular age groups). Instead, the legislature relied on undefined societal or community standards.

--------

[3] The provision of New York law under which the petitioner was convicted in *Ginsberg* was framed with similar specificity. This provision applied to depictions of "nudity" and "sexual conduct," and both those terms were specifically and unambiguously defined. See 390 U. S., at 645–647 (Appendix A to opinion of the Court).

[4] The California law does not define the term "maiming," nor has the State cited any decisions from its courts that define the term in this context. Accordingly, I take the term to have its ordinary meaning, which includes the infliction of any serious wound, see Webster's Third New International Dictionary 1362 (2002) (hereinafter Webster's).

One of the three elements at issue here refers expressly to "prevailing standards in the community as to what is suitable for minors." §1746(d)(1)(A)(ii). Another element points in the same direction, asking whether "[a] reasonable person, considering [a] game as a whole," would find that it "appeals to a *deviant* or *morbid* interest of minors." §1746(d)(1)(A)(i) (emphasis added).

The terms "deviant" and "morbid" are not defined in the statute, and California offers no reason to think that its courts would give the terms anything other than their ordinary meaning. See Reply Brief for Petitioners 5 (arguing that "[a] reasonable person can make this judgment through . . . a common understanding and definition of the applicable terms"). I therefore assume that "deviant" and "morbid" carry the meaning that they convey in ordinary speech. The adjective "deviant" ordinarily means "deviating . . . from some accepted norm," and the term "morbid" means "of, relating to, or characteristic of disease." Webster's 618, 1469. A "deviant or morbid interest" in violence, therefore, appears to be an interest that deviates from what is regarded—presumably in accordance with some generally accepted standard—as normal and healthy. Thus, the application of the California law is heavily dependent on the identification of generally accepted standards regarding the suitability of violent entertainment for minors.

The California Legislature seems to have assumed that these standards are sufficiently well known so that a person of ordinary intelligence would have fair notice as to whether the kind and degree of violence in a particular game is enough to qualify the game as "violent." And because the *Miller* test looks to community standards, the legislature may have thought that the use of undefined community standards in the violent video game law would not present vagueness problems.

There is a critical difference, however, between obscen-

ity laws and laws regulating violence in entertainment. By the time of this Court's landmark obscenity cases in the 1960's, obscenity had long been prohibited, see *Roth*, 354 U. S., at 484–485, and this experience had helped to shape certain generally accepted norms concerning expression related to sex.

There is no similar history regarding expression related to violence. As the Court notes, classic literature contains descriptions of great violence, and even children's stories sometimes depict very violent scenes. See *ante*, at 8–9.

Although our society does not generally regard all depictions of violence as suitable for children or adolescents, the prevalence of violent depictions in children's literature and entertainment creates numerous opportunities for reasonable people to disagree about which depictions may excite "deviant" or "morbid" impulses. See Edwards & Berman, Regulating Violence on Television, 89 Nw. U. L. Rev. 1487, 1523 (1995) (observing that the *Miller* test would be difficult to apply to violent expression because "there is nothing even approaching a consensus on low-value violence").

Finally, the difficulty of ascertaining the community standards incorporated into the California law is compounded by the legislature's decision to lump all minors together. The California law draws no distinction between young children and adolescents who are nearing the age of majority.

In response to a question at oral argument, the attorney defending the constitutionality of the California law said that the State would accept a narrowing construction of the law under which the law's references to "minors" would be interpreted to refer to the oldest minors—that is, those just short of 18. Tr. of Oral Arg. 11–12. However, "it is not within our power to construe and narrow state laws." *Grayned*, 408 U. S., at 110. We can only "'extrapolate [their] allowable meaning'" from the statutory text and authoritative interpretations of similar laws by courts

of the State. *Ibid.* (quoting *Garner* v. *Louisiana*, 368 U. S. 157, 174 (1961) (Frankfurter, J., concurring in judgment)).

In this case, California has not provided any evidence that the California Legislature intended the law to be limited in this way, or cited any decisions from its courts that would support an "oldest minors" construction.[5]

For these reasons, I conclude that the California violent video game law fails to provide the fair notice that the Constitution requires. And I would go no further. I would not express any view on whether a properly drawn statute would or would not survive First Amendment scrutiny. We should address that question only if and when it is necessary to do so.

## II

Having outlined how I would decide this case, I will now briefly elaborate on my reasons for questioning the wisdom of the Court's approach. Some of these reasons are touched upon by the dissents, and while I am not prepared at this time to go as far as either JUSTICE THOMAS or JUSTICE BREYER, they raise valid concerns.

## A

The Court is wrong in saying that the holding in *United States* v. *Stevens*, 559 U. S. ___ (2010), "controls this case." *Ante*, at 4. First, the statute in *Stevens* differed sharply from the statute at issue here. *Stevens* struck down a law that broadly prohibited *any person* from creating, selling, or possessing depictions of animal cruelty for commercial gain. The California law involved here, by contrast, is

––––––––

[5] At oral argument, California also proposed that the term "minors" could be interpreted as referring to the "typical age group of minors" who play video games. Tr. of Oral Arg. 11. But nothing in the law's text supports such a limitation. Nor has California cited any decisions indicating that its courts would restrict the law in this way. And there is nothing in the record indicating what this age group might be.

limited to the sale or rental of violent video games *to minors*. The California law imposes no restriction on the creation of violent video games, or on the possession of such games by anyone, whether above or below the age of 18. The California law does not regulate the sale or rental of violent games by adults. And the California law does not prevent parents and certain other close relatives from buying or renting violent games for their children or other young relatives if they see fit.

Second, *Stevens* does not support the proposition that a law like the one at issue must satisfy strict scrutiny. The portion of *Stevens* on which the Court relies rejected the Government's contention that depictions of animal cruelty were categorically outside the range of *any* First Amendment protection. 559 U. S., at __ (slip op., at 5). Going well beyond *Steven*s, the Court now holds that any law that attempts to prevent minors from purchasing violent video games must satisfy strict scrutiny instead of the more lenient standard applied in *Ginsberg*, 390 U. S. 629, our most closely related precedent. As a result of today's decision, a State may prohibit the sale to minors of what *Ginsberg* described as "girlie magazines," but a State must surmount a formidable (and perhaps insurmountable) obstacle if it wishes to prevent children from purchasing the most violent and depraved video games imaginable.

Third, *Stevens* expressly left open the possibility that a more narrowly drawn statute targeting depictions of animal cruelty might be compatible with the First Amendment. See 559 U. S., at ___ (slip op., at 19). In this case, the Court's sweeping opinion will likely be read by many, both inside and outside the video-game industry, as suggesting that no regulation of minors' access to violent video games is allowed—at least without supporting evidence that may not be realistically obtainable given the nature of the phenomenon in question.

ALITO, J., concurring in judgment

B

The Court's opinion distorts the effect of the California law. I certainly agree with the Court that the government has no "free-floating power to restrict the ideas to which children may be exposed," *ante*, at 7, but the California law does not exercise such a power. If parents want their child to have a violent video game, the California law does not interfere with that parental prerogative. Instead, the California law reinforces parental decisionmaking in exactly the same way as the New York statute upheld in *Ginsberg*. Under both laws, minors are prevented from purchasing certain materials; and under both laws, parents are free to supply their children with these items if that is their wish.

Citing the video-game industry's voluntary rating system, the Court argues that the California law does not "meet a substantial need of parents who wish to restrict their children's access to violent video games but cannot do so." *Ante*, at 15. The Court does not mention the fact that the industry adopted this system in response to the threat of federal regulation, Brief for Activision Blizzard, Inc., as *Amicus Curiae* 7–10, a threat that the Court's opinion may now be seen as largely eliminating. Nor does the Court acknowledge that compliance with this system at the time of the enactment of the California law left much to be desired[6]—or that future enforcement may decline if the video-game industry perceives that any threat of government regulation has vanished. Nor does

_____

[6] A 2004 Federal Trade Commission Report showed that 69 percent of unaccompanied children ages 13 to 16 were able to buy M-rated games and that 56 percent of 13-year-olds were able to buy an M-rated game. Marketing Violent Entertainment to Children: A Fourth Follow-Up Review of Industry Practices in the Motion Picture, Music Recording & Electronic Game Industries 26–28 (July 2004), http://www.ftc.gov/os/2004/07/040708kidsviolencerpt.pdf (all Internet materials as visited June 24, 2011, and available in Clerk of Court's case file).

the Court note, as JUSTICE BREYER points out, see *post*, at 11 (dissenting opinion), that many parents today are simply not able to monitor their children's use of computers and gaming devices.

C

Finally, the Court is far too quick to dismiss the possibility that the experience of playing video games (and the effects on minors of playing violent video games) may be very different from anything that we have seen before. Any assessment of the experience of playing video games must take into account certain characteristics of the video games that are now on the market and those that are likely to be available in the near future.

Today's most advanced video games create realistic alternative worlds in which millions of players immerse themselves for hours on end. These games feature visual imagery and sounds that are strikingly realistic, and in the near future video-game graphics may be virtually indistinguishable from actual video footage.[7] Many of the games already on the market can produce high definition images,[8] and it is predicted that it will not be long before video-game images will be seen in three dimensions.[9] It is also forecast that video games will soon provide sensory

_____

[7] See Chayka, Visual Games: Photorealism in Crisis, Kill Screen (May 2011), http://killscreendaily.com/articles/visual-games-photorealism-crisis.

[8] To see brief video excerpts from games with highly realistic graphics, see Spike TV Video Game Awards 2010—Game of the Year Nominees, GameTrailers.com (Dec. 10, 2010), http://www.gametrailers.com/video/game-of-spike-tv-vga/707755?type=flv.

[9] See Selleck, Sony PS3 Launching 50 3D-Capable Video Games in the Near Future, SlashGear (Nov. 23, 2010), http://www.slashgear.com/sony-ps3-launching-50-3d-capable-video-games-in-the-near-future-23115866; Sofge, Why 3D Doesn't Work for TV, But Is Great for Gaming, Popular Mechanics (Mar. 11, 2010), http://www.popularmechanics.com/technology/digital/gaming/4342437.

feedback.[10]  By wearing a special vest or other device, a player will be able to experience physical sensations supposedly felt by a character on the screen.[11]  Some *amici* who support respondents foresee the day when "'virtual-reality shoot-'em-ups'" will allow children to "'actually feel the splatting blood from the blown-off head'" of a victim. Brief for Reporters Comm. for Freedom of the Press et al. as *Amici Curiae* 29 (quoting H. Schechter, Savage Pastimes 18 (2005)).

Persons who play video games also have an unprecedented ability to participate in the events that take place in the virtual worlds that these games create.  Players can create their own video-game characters and can use photos to produce characters that closely resemble actual people.  A person playing a sophisticated game can make a multitude of choices and can thereby alter the course of the action in the game.  In addition, the means by which players control the action in video games now bear a closer relationship to the means by which people control action in the real world.  While the action in older games was often directed with buttons or a joystick, players dictate the action in newer games by engaging in the same mo-

--------

[10] T. Chatfield, Fun Inc.: Why Games are the Twenty-first Century's Most Serious Business 211 (2010) (predicting that "[w]e can expect . . . physical feedback and motion detection as standard in every gaming device in the near future"); J. Blascovich & J. Bailenson, Infinite Reality: Avatars, Eternal Life, New Worlds, and the Dawn of the Virtual Revolution 2 (2011) ("Technological developments powering virtual worlds are accelerating, ensuring that virtual experiences will become more *immersive* by providing sensory information that makes people feel they are 'inside' virtual worlds" (emphasis in the original)).

[11] See Topolsky, The Mindwire V5 Turns Gaming into Pure Electroshock Torture, Engadget (Mar. 9, 2008), http://www.engadget.com/2008/03/09/the-mindwire-v5-turns-gaming-into-pure-electroshock-torture; Greenemeier, Video Game Vest Simulates Sensation of Being Capped, Scientific American (Oct. 25, 2007), http://www.scientificamerican.com/article.cfm?id=video-game-vest-simulates.

tions that they desire a character in the game to per-form.[12]  For example, a player who wants a video-game character to swing a baseball bat—either to hit a ball or smash a skull—could bring that about by simulating the motion of actually swinging a bat.

These present-day and emerging characteristics of video games must be considered together with characteristics of the violent games that have already been marketed.

In some of these games, the violence is astounding.[13] Victims by the dozens are killed with every imaginable implement, including machine guns, shotguns, clubs, hammers, axes, swords, and chainsaws.  Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into little pieces.  They cry out in agony and beg for mercy.  Blood gushes, splatters, and pools.  Severed body parts and gobs of human remains are graphically shown.  In some games, points are awarded based, not only on the number of victims killed, but on the killing technique employed.

It also appears that there is no antisocial theme too base for some in the video-game industry to exploit.  There are games in which a player can take on the identity and reenact the killings carried out by the perpetrators of the murders at Columbine High School and Virginia Tech.[14]

––––––––––

[12] See Schiesel, A Real Threat Now Faces the Nintendo Wii, N. Y. Times, Dec. 3, 2010, p. F7 (describing how leading developers of video-game consoles are competing to deliver gesture-controlled gaming devices).

[13] For a sample of violent video games, see Wilson, The 10 Most Violent Video Games of All Time, PCMag.com (Feb. 10, 2011), http://www.pcmag.com/article2/0,2817,2379959,00.asp.  To see brief video excerpts from violent games, see Chomik, Top 10: Most Violent Video Games, AskMen.com, http://www.askmen.com/top_10/videogame/top-10-most-violent-video-games.html; Sayed, 15 Most Violent Video Games That Made You Puke, Gamingbolt (May 2, 2010), http://gamingbolt.com/15-most-violent-video-games-that-made-you-puke.

[14] Webley, "School Shooter" Video Game to Reenact Columbine, Vir-

The objective of one game is to rape a mother and her daughters;[15] in another, the goal is to rape Native American women.[16] There is a game in which players engage in "ethnic cleansing" and can choose to gun down African-Americans, Latinos, or Jews.[17] In still another game, players attempt to fire a rifle shot into the head of President Kennedy as his motorcade passes by the Texas School Book Depository.[18]

If the technological characteristics of the sophisticated games that are likely to be available in the near future are combined with the characteristics of the most violent games already marketed, the result will be games that allow troubled teens to experience in an extraordinarily personal and vivid way what it would be like to carry out unspeakable acts of violence.

The Court is untroubled by this possibility. According to the Court, the "interactive" nature of video games is "nothing new" because "all literature is interactive." *Ante*, at 10–11. Disagreeing with this assessment, the International Game Developers Association (IGDA)—a group that presumably understands the nature of video games and that supports respondents—tells us that video games are

---

ginia Tech Killings, Time (Apr. 20, 2011), http://newsfeed.time.com/ 2011/04/20/school-shooter-video-game-reenacts-columbine-virginia-tech- killings. After a Web site that made School Shooter available for download removed it in response to mounting criticism, the developer stated that it may make the game available on its own Web site. Inside the Sick Site of a School Shooter Mod (Mar. 26, 2011), http://ssnat.com.

[15] Lah, "RapeLay" Video Game Goes Viral Amid Outrage, CNN (Mar. 30, 2010), http://articles.cnn.com/2010-03-30/world/japan.video. game.rape_1_game-teenage-girl-japanese-government?_s=PM:WORLD.

[16] Graham, Custer May be Shot Down Again in a Battle of the Sexes Over X-Rated Video Games, People, Nov. 15, 1982, pp. 110, 115.

[17] Scheeres, Games Elevate Hate to Next Level, Wired (Feb. 20, 2002), http://www.wired.com/culture/lifestyle/news/2002/02/50523.

[18] Thompson, A View to a Kill: JFK Reloaded is Just Plain Creepy, Slate (Nov. 22, 2004), http://www.slate.com/id/2110034.

"far more concretely interactive." Brief for IGDA et al. as *Amici Curiae* 3. And on this point, the game developers are surely correct.

It is certainly true, as the Court notes, that "'[l]iterature, when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own.'" *Ante*, at 11 (quoting *American Amusement Machine Assn.* v. *Kendrick*, 244 F. 3d 572, 577 (CA7 2001)). But only an extraordinarily imaginative reader who reads a description of a killing in a literary work will experience that event as vividly as he might if he played the role of the killer in a video game. To take an example, think of a person who reads the passage in Crime and Punishment in which Raskolnikov kills the old pawn broker with an axe. See F. Dostoyevsky, Crime and Punishment 78 (Modern Library ed. 1950). Compare that reader with a video-game player who creates an avatar that bears his own image; who sees a realistic image of the victim and the scene of the killing in high definition and in three dimensions; who is forced to decide whether or not to kill the victim and decides to do so; who then pretends to grasp an axe, to raise it above the head of the victim, and then to bring it down; who hears the thud of the axe hitting her head and her cry of pain; who sees her split skull and feels the sensation of blood on his face and hands. For most people, the two experiences will not be the same.[19]

When all of the characteristics of video games are taken into account, there is certainly a reasonable basis for

_____

[19] As the Court notes, there are a few children's books that ask young readers to step into the shoes of a character and to make choices that take the stories along one of a very limited number of possible lines. See *ante*, at 10. But the very nature of the print medium makes it impossible for a book to offer anything like the same number of choices as those provided by a video game.

thinking that the experience of playing a video game may be quite different from the experience of reading a book, listening to a radio broadcast, or viewing a movie. And if this is so, then for at least some minors, the effects of playing violent video games may also be quite different. The Court acts prematurely in dismissing this possibility out of hand.

\*     \*     \*

For all these reasons, I would hold only that the particular law at issue here fails to provide the clear notice that the Constitution requires. I would not squelch legislative efforts to deal with what is perceived by some to be a significant and developing social problem. If differently framed statutes are enacted by the States or by the Federal Government, we can consider the constitutionality of those laws when cases challenging them are presented to us.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1448

_____

## EDMUND G. BROWN, JR., GOVERNOR OF CAL-IFORNIA, ET AL., PETITIONERS *v.* ENTERTAIN-MENT MERCHANTS ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 27, 2011]

JUSTICE THOMAS, dissenting.

The Court's decision today does not comport with the original public understanding of the First Amendment. The majority strikes down, as facially unconstitutional, a state law that prohibits the direct sale or rental of certain video games to minors because the law "abridg[es] the freedom of speech." U. S. Const., Amdt. 1. But I do not think the First Amendment stretches that far. The practices and beliefs of the founding generation establish that "the freedom of speech," as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians. I would hold that the law at issue is not facially unconstitutional under the First Amendment, and reverse and remand for further proceedings.[1]

_____

[1] JUSTICE ALITO concludes that the law is too vague to satisfy due process, but neither the District Court nor the Court of Appeals addressed that question. *Ante*, at 2–9 (opinion concurring in judgment). As we have often said, this Court is "one of final review, 'not of first view.' " *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 25) (quoting *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005)).

## I

When interpreting a constitutional provision, "the goal is to discern the most likely public understanding of [that] provision at the time it was adopted." *McDonald* v. *Chicago*, 561 U. S. ___, ___ (2010) (slip op., at 25) (THOMAS, J., concurring in part and concurring in judgment). Because the Constitution is a written instrument, "its meaning does not alter." *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 359 (1995) (THOMAS, J., concurring in judgment) (internal quotation marks omitted). "That which it meant when adopted, it means now." *Ibid.* (internal quotation marks omitted).

As originally understood, the First Amendment's protection against laws "abridging the freedom of speech" did not extend to *all* speech. "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942); see also *United States* v. *Stevens*, 559 U. S. ___, ___ (2010) (slip op., at 5–6). Laws regulating such speech do not "abridg[e] the freedom of speech" because such speech is understood to fall outside "the freedom of speech." See *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 245–246 (2002).

In my view, the "practices and beliefs held by the Founders" reveal another category of excluded speech: speech to minor children bypassing their parents. *McIntyre*, *supra,* at 360. The historical evidence shows that the founding generation believed parents had absolute authority over their minor children and expected parents to use that authority to direct the proper development of their children. It would be absurd to suggest that such a society understood "the freedom of speech" to include a right to speak to minors (or a corresponding right of minors to access speech) without going through the minors' parents. Cf. Brief for Common Sense Media as *Amicus Curiae* 12–

15. The founding generation would not have considered it an abridgment of "the freedom of speech" to support parental authority by restricting speech that bypasses minors' parents.

### A

Attitudes toward children were in a state of transition around the time that the States ratified the Bill of Rights. A complete understanding of the founding generation's views on children and the parent-child relationship must therefore begin roughly a century earlier, in colonial New England.

In the Puritan tradition common in the New England Colonies, fathers ruled families with absolute authority. "The patriarchal family was the basic building block of Puritan society." S. Mintz, Huck's Raft 13 (2004) (hereinafter Mintz); see also R. MacDonald, Literature for Children in England and America from 1646 to 1774, p. 7 (1982) (hereinafter MacDonald). The Puritans rejected many customs, such as godparenthood, that they considered inconsistent with the patriarchal structure. Mintz 13.

Part of the father's absolute power was the right and duty "to fill his children's minds with knowledge and . . . make them apply their knowledge in right action." E. Morgan, The Puritan Family 97 (rev. ed. 1966) (hereinafter Morgan). Puritans thought children were "innately sinful and that parents' primary task was to suppress their children's natural depravity." S. Mintz & S. Kellogg, Domestic Revolutions 2 (1988) (hereinafter Mintz & Kellogg); see also B. Wadsworth, The Well-Ordered Family 55 (1712) ("Children should not be left to themselves . . . to do as they please; . . . not being fit to govern themselves"); C. Mather, A Family Well-Ordered 38 (1699). Accordingly, parents were not to let their children read "vain Books, profane Ballads, and filthy Songs" or "fond and amorous

Romances, . . . fabulous Histories of Giants, the bombast Achievements of Knight Errantry, and the like."  The History of Genesis, pp. vi–vii (3d ed. corrected 1708).

This conception of parental authority was reflected in laws at that time.  In the Massachusetts Colony, for example, it was unlawful for tavern keepers (or anyone else) to entertain children without their parents' consent. 2 Records and Files of the Quarterly Courts of Essex County, Massachusetts, p. 180 (1912); 4 *id.,* at 237, 275 (1914); 5 *id.,* at 143 (1916); see also Morgan 146.  And a "stubborn or rebellious son" of 16 years or more committed a capital offense if he disobeyed "the voice of his Father, or the voice of his Mother."  The Laws and Liberties of Massachusetts 6 (1648) (reprint M. Farrand ed. 1929); see also J. Kamensky, Governing the Tongue 102, n. 14 (1997) (citing similar laws in the Connecticut, New Haven, Plymouth, and New Hampshire Colonies in the late 1600's).

### B

In the decades leading up to and following the Revolution, attitudes towards children changed.  See, *e.g.,* J. Reinier, From Virtue to Character: American Childhood, 1775–1850, p. 1 (1996) (hereinafter Reinier).  Children came to be seen less as innately sinful and more as blank slates requiring careful and deliberate development.  But the same overarching principles remained.  Parents continued to have both the right and duty to ensure the proper development of their children.  They exercised significant authority over their children, including control over the books that children read.  And laws at the time continued to reflect strong support for parental authority and the sense that children were not fit to govern themselves.

### 1

The works of John Locke and Jean-Jacques Rousseau

were a driving force behind the changed understanding of children and childhood. See Reinier 2–5; H. Brewer, By Birth or Consent 97 (2005) (hereinafter Brewer); K. Calvert, Children in the House 59–60 (1992) (hereinafter Calvert). Locke taught that children's minds were blank slates and that parents therefore had to be careful and deliberate about what their children were told and observed. Parents had only themselves to blame if, "by humouring and cockering" their children, they "poison'd the fountain" and later "taste[d] the bitter waters." Some Thoughts Concerning Education (1692), in 37 English Philosophers of the Seventeenth and Eighteenth Centuries 27–28 (C. Eliot ed. 1910). All vices, he explained, were sowed by parents and "those about children." *Id.,* at 29. Significantly, Locke did not suggest circumscribing parental authority but rather articulated a new basis for it. Rousseau disagreed with Locke in important respects, but his philosophy was similarly premised on parental control over a child's development. Although Rousseau advocated that children should be allowed to develop naturally, he instructed that the environment be directed by "a tutor who is given total control over the child and who removes him from society, from all competing sources of authority and influence." J. Fliegelman, Prodigals and Pilgrims 30 (1982) (hereinafter Fliegelman); see also Reinier 15.

These writings received considerable attention in America. Locke's An Essay Concerning Human Understanding and his Some Thoughts Concerning Education were significantly more popular than his Two Treatises of Government, according to a study of 92 colonial libraries between 1700 and 1776. Lundberg & May, The Enlightened Reader in America, 28 American Quarterly 262, 273 (1976) (hereinafter Lundberg). And Rousseau's Emile, a treatise on education, was more widely advertised and distributed than his political work, The Social Contract. Fliegelman 29; see also Lundberg 285. In general, the

most popular books in the Colonies on the eve of the American Revolution were not political discourses but ones concerned with child rearing. See Mintz & Kellogg 45.

2

Locke's and Rousseau's writings fostered a new conception of childhood. Children were increasingly viewed as malleable creatures, and childhood came to be seen as an important period of growth, development, and preparation for adulthood. See Mintz & Kellogg 17, 21, 47; M. Grossberg, Governing the Hearth 8 (1985) (hereinafter Grossberg). Noah Webster, called the father of American education, wrote that "[t]he impressions received in early life usually form the characters of individuals." On the Education of Youth in America (1790) (hereinafter Webster), in Essays on Education in the Early Republic 43 (F. Rudolph ed. 1965) (hereinafter Rudolph); cf. Slater, Noah Webster: Founding Father of American Scholarship and Education, in Noah Webster's First Edition of an American Dictionary of the English Language (1967). Elizabeth Smith, sister-in-law to John Adams, similarly wrote: "The Infant Mind, I beleive[,] is a blank, that eassily receives any impression." M. Norton, Liberty's Daughters 101 (1996) (internal quotation marks omitted) (hereinafter Norton); see also S. Doggett, A Discourse on Education (1796) (hereinafter Doggett), in Rudolph 151 ("[I]n early youth, . . . every power and capacity is pliable and susceptible of any direction or impression"); J. Abbott, The Mother at Home 2 (1834) (hereinafter Abbott) ("What impressions can be more strong, and more lasting, than those received upon the mind in the freshness and the susceptibility of youth").

Children lacked reason and decisionmaking ability. They "have not Judgment or Will of their own," John Adams noted. Letter to James Sullivan (May 26, 1776), in

4 Papers of John Adams 210 (R. Taylor ed. 1979); see also
Vol. 1 1787: Drafting the Constitution, p. 229 (W. Benton
ed. 1986) (quoting Gouvernor Morris in James Madison's
notes from the Constitutional Convention explaining that
children do not vote because they "want prudence" and
"have no will of their own"). Children's "utter incapacity"
rendered them "almost wholly at the mercy of their Par-
ents or Instructors for a set of habits to regulate their
whole conduct through life." J. Burgh, Thoughts on Edu-
cation 7 (1749) (hereinafter Burgh).

This conception of childhood led to great concern about
influences on children. "Youth are ever learning to do
what they see others around them doing, and these imita-
tions grow into habits." Doggett, in Rudolph 151; see also
B. Rush, A Plan for the Establishment of Public Schools
(1786) (hereinafter Rush), in Rudolph 16 ("The vices of
young people are generally learned from each other");
Webster, in Rudolph 58 ("[C]hildren, artless and unsus-
pecting, resign their hearts to any person whose manners
are agreeable and whose conduct is respectable"). Books
therefore advised parents "not to put children in the way
of those whom you dare not trust." L. Child, The Mother's
Book 149 (1831) (hereinafter Child); see also S. Coontz,
The Social Origins of Private Life 149–150 (1988) (noting
that it was "considered dangerous to leave children to the
supervision of servants or apprentices").

As a result, it was widely accepted that children needed
close monitoring and carefully planned development. See
B. Wishy, The Child and the Republic 24–25, 32 (1968)
(hereinafter Wishy); Grossberg 8. Managing the young
mind was considered "infinitely important." Doggett, in
Rudolph 151; see also A. MacLeod, A Moral Tale 72–73
(1975) (hereinafter MacLeod). In an essay on the educa-
tion of youth in America, Noah Webster described the
human mind as "a rich field, which, without constant care,
will ever be covered with a luxuriant growth of weeds."

Rudolph 54. He advocated sheltering children from "every low-bred, drunken, immoral character" and keeping their minds "untainted till their reasoning faculties have acquired strength and the good principles which may be planted in their minds have taken deep root." *Id.,* at 63; see also Rush, in *id.,* at 16 ("[T]he most useful citizens have been formed from those youth who have never known or felt their own wills till they were one and twenty years of age"); Burgh 7 ("[T]he souls of Youth are more immediately committed to the care of Parents and Instructors than even those of a People are to their Pastor").

The Revolution only amplified these concerns. The Republic would require virtuous citizens, which necessitated proper training from childhood. See Mintz 54, 71; MacLeod 40; Saxton, French and American Childhoods, in Children and Youth in a New Nation 69 (J. Marten ed. 2009) (hereinafter Marten); see also W. Cardell, Story of Jack Halyard, pp. xv–xvi (30th ed. 1834) (hereinafter Cardell) ("[T]he glory and efficacy of our institutions will soon rest with those who are growing up to succede us"). Children were "the pivot of the moral world," and their proper development was "a subject of as high interest, as any to which the human mind ha[d] ever been called." *Id.,* at xvi.

3

Based on these views of childhood, the founding generation understood parents to have a right and duty to govern their children's growth. Parents were expected to direct the development and education of their children and ensure that bad habits did not take root. See Calvert 58–59; MacLeod 72; Mintz & Kellogg 23. They were responsible for instilling "moral prohibitions, behavioral standards, and a capacity for self-government that would prepare a child for the outside world." Mintz & Kellogg 58; see also Youth's Companion, Apr. 16, 1827, p. 1 (hereinafter

Youth's Companion) ("Let [children's] minds be formed, their hearts prepared, and their characters moulded for the scenes and the duties of a brighter day"). In short, "[h]ome and family bore the major responsibility for the moral training of children and thus, by implication, for the moral health of the nation." MacLeod 29; see also Introduction, in Marten 6; Reinier, p. xi; Smith, Autonomy and Affection: Parents and Children in Eighteenth-Century Chesapeake Families, in Growing up in America 54 (N. Hiner & J. Hawes eds. 1985).

This conception of parental rights and duties was exemplified by Thomas Jefferson's approach to raising children. He wrote letters to his daughters constantly and often gave specific instructions about what the children should do. See, *e.g.,* Letter to Martha Jefferson (Nov. 28, 1783), in S. Randolph, The Domestic Life of Thomas Jefferson 44 (1939) (dictating her daily schedule of music, dancing, drawing, and studying); Letter to Martha Jefferson (Dec. 22, 1783), in *id.,* at 45–46 ("I do not wish you to be gaily clothed at this time of life . . . . [A]bove all things and at all times let your clothes be neat, whole, and properly put on"). Jefferson expected his daughter, Martha, to write "by every post" and instructed her, "Inform me what books you read [and] what tunes you learn." Letter (Nov. 28, 1783), in *id.,* at 44. He took the same approach with his nephew, Peter Carr, after Carr's father died. See Letter (Aug. 19, 1785), in 8 The Papers of Thomas Jefferson 405–408 (J. Boyd ed. 1953) (detailing a course of reading and exercise, and asking for monthly progress reports describing "in what manner you employ every hour in the day"); see also 3 Dictionary of Virginia Biography 29 (2006).

Jefferson's rigorous management of his charges was not uncommon. "[M]uch evidence indicates that mothers and fathers both believed in giving their children a strict upbringing, enforcing obedience to their commands and stressing continued subjection to the parental will." Nor-

ton 96.  Two parenting books published in the 1830's gave prototypical advice.  In The Mother's Book, Lydia Child advised that "[t]he first and most important step in management is, that whatever a mother says, always *must* be done."  Child 26.  John Abbott, the author of The Mother at Home, likewise advised that "[o]bedience is absolutely essential to proper family government."  Abbott 18.  Echoing Locke, Abbott warned that parents who indulged a child's "foolish and unreasonable wishes" would doom that child to be indulgent in adulthood.  *Id.,* at 16.

The concept of total parental control over children's lives extended into the schools.  "The government both of families and schools should be absolute," declared Noah Webster.  Rudolph 57–58.  Dr. Benjamin Rush concurred: "In the education of youth, let the authority of our masters be as *absolute* as possible."  *Id.,* at 16.  Through the doctrine of *in loco parentis*, teachers assumed the "'sacred dut[y] of parents . . . to train up and qualify their children'" and exercised the same authority "'to command obedience, to control stubbornness, to quicken diligence, and to reform bad habits.'"  *Morse* v. *Frederick*, 551 U. S. 393, 413–414 (2007) (THOMAS, J., concurring) (quoting *State* v. *Pendergrass*, 19 N. C. 365, 365–366 (1837)); see also Wishy 73.  Thus, the quality of teachers and schools had to "be watched with the most scrupulous attention."  Webster, in Rudolph 64.

For their part, children were expected to be dutiful and obedient.  Mintz & Kellogg 53; Wishy 31; cf. J. Kett, Rites of Passage 45 (1977).  Schoolbooks instructed children to do so and frequently featured vignettes illustrating the consequences of disobedience.  See Adams, "Pictures of the Vicious ultimately overcome by misery and shame": The Cultural Work of Early National Schoolbooks (hereinafter Adams), in Marten 156.  One oft-related example was the hangings of 19 alleged witches in 1692, which, the schoolbooks noted, likely began with false complaints by two

young girls. See J. Morse, The American Geography 191 (1789); see also Adams, in Marten 164.

An entire genre of books, "loosely termed 'advice to youth,'" taught similar lessons well into the 1800's. J. Demos, Circles and Lines: The Shape of Life in Early America 73 (2004); cf. Wishy 54. "Next to your duty to God," advised one book, "is your duty to your parents" even if the child did not "understand the reason of their commands." L. Sigourney, The Girl's Reading Book 44 (14th ed. 1843); see also Filial Duty Recommended and Enforced, Introduction, p. iii (c. 1798); The Parent's Present 44 (3d ed. 1841). "Disobedience is generally punished in some way or other," warned another, "and often very severely." S. Goodrich, Peter Parley's Book of Fables 43 (1836); see also The Country School-House 27 (1848) ("[T]he number of children who die from the effects of disobedience to their parents is very large").

4

Society's concern with children's development extended to the books they read. "Vice always spreads by being published," Noah Webster observed. Rudolph 62. "[Y]oung people are taught many vices by fiction, books, or public exhibitions, vices which they never would have known had they never read such books or attended such public places." *Ibid.;* see also Cardell, p. xii (cautioning parents that "[t]he first reading lessons for children have an extensive influence on the acquisitions and habits of future years"); Youth's Companion 1 ("[T]he capacities of children, and the peculiar situation and duties of youth, require select and appropriate reading"). Prominent children's authors harshly criticized fairy tales and the use of anthropomorphic animals. See, *e.g.,* S. Goodrich, 2 Recollections of a Lifetime 320, n.* (1856) (describing fairy tales as "calculated to familiarize the mind with things shocking and monstrous; to cultivate a taste for tales of

bloodshed and violence; to teach the young to use coarse language, and cherish vulgar ideas; . . . and to fill [the youthful mind] with the horrors of a debased and de-bauched fancy"); 1 *id.,* at 167 (recalling that children's books were "full of nonsense" and "lies"); Cardell, p. xiv ("The fancy of converting inferior animals into 'teachers of children,' has been carried to ridiculous extravagance"); see also MacDonald 83, 103 (noting that fables and works of fantasy were not popular in America in the 1700's).

Adults carefully controlled what they published for children. Stories written for children were dedicated to moral instruction and were relatively austere, lacking details that might titillate children's minds. See MacLeod 24–25, 42–48; see also *id.,* at 42 ("The authors of juvenile fiction imposed the constraints upon themselves in the name of duty, and for the sake of giving children what they thought children should have, although they were often well aware that children might prefer more exciting fare"); Francis, American Children's Literature, 1646–1880, in American Childhood 208–209 (J. Hawes & N. Hiner eds. 1985). John Newbery, the publisher often credited with creating the genre of children's literature, removed traditional folk characters, like Tom Thumb, from their original stories and placed them in new morality tales in which good children were rewarded and dis-obedient children punished. Reinier 12.

Parents had total authority over what their children read. See A. MacLeod, American Childhood 177 (1994) ("Ideally, if not always actually, nineteenth-century par-ents regulated their children's lives fully, certainly includ-ing their reading"). Lydia Child put it bluntly in The Mother's Book: "Children . . . should not read anything without a mother's knowledge and sanction; this is par-ticularly necessary between the ages of twelve and six-teen." Child 92; see also *id.,* at 143 ("[P]arents, or some guardian friends, should carefully examine every volume

they put into the hands of young people"); E. Monaghan, Learning to Read and Write in Colonial America 337 (2005) (reviewing a 12-year-old girl's journal from the early 1770's and noting that the child's aunts monitored and guided her reading).

5

The law at the time reflected the founding generation's understanding of parent-child relations. According to Sir William Blackstone, parents were responsible for maintaining, protecting, and education their children, and therefore had "power" over their children. 1 Commentaries on the Laws of England 434, 440 (1765); cf. *Washington* v. *Glucksberg*, 521 U. S. 702, 712 (1997) (Blackstone's Commentaries was "a primary legal authority for 18th- and 19th-century American lawyers"). Chancellor James Kent agreed. 2 Commentaries on American Law *189– *207. The law entitled parents to "the custody of their [children]," "the value of th[e] [children's] labor and services," and the "right to the exercise of such discipline as may be requisite for the discharge of their sacred trust." *Id.,* at *193, *203. Children, in turn, were charged with "obedience and assistance during their own minority, and gratitude and reverance during the rest of their lives." *Id.,* at *207.

Thus, in case after case, courts made clear that parents had a right to the child's labor and services until the child reached majority. In 1810, the Supreme Judicial Court of Massachusetts explained, "There is no question but that a father, who is entitled to the services of his minor son, and for whom he is obliged to provide, may, at the common law, assign those services to others, for a consideration to enure to himself." *Day* v. *Everett,* 7 Mass. 145, 147; see also *Benson* v. *Remington*, 2 Mass. 113, 115 (1806) (opinion of Parsons, C. J.) ("The law is very well settled, that parents are under obligations to support their children,

and that they are entitled to their earnings"). Similarly, the Supreme Court of Judicature of New Hampshire noted that the right of parents to recover for the services of their child, while a minor, "cannot be contested." *Gale* v. *Parrot*, 1 N. H. 28, 29 (1817). And parents could bring tort suits against those who knowingly enticed a minor away from them. See, *e.g., Kirkpatrick* v. *Lockhart*, 2 Brev. 276 (S. C. Constitutional Ct. 1809); *Jones* v. *Tevis*, 4 Litt. 25 (Ky. App. 1823).

Relatedly, boys could not enlist in the military without parental consent. Many of those who did so during the Revolutionary War found, afterwards, that their fathers were entitled to their military wages. See Cox, Boy Soldiers of the American Revolution, in Marten 21–24. And after the war, minors who enlisted without parental consent in violation of federal law could find themselves returned home on writs of habeas corpus issued at their parents' request. See, *e.g., United States* v. *Anderson*, 24 F. Cas. 813 (No. 14,449) (CC Tenn. 1812); *Commonwealth* v. *Callan*, 6 Binn. 255 (Pa. 1814) *(per curiam).*

Laws also set age limits restricting marriage without parental consent. For example, from 1730 until at least 1849, Pennsylvania law required parental consent for the marriage of anyone under the age of 21. See 4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897) (hereinafter Pa. Stats. at Large); General Laws of Pennsylvania 82–83 (J. Dunlop 2d ed. 1849) (including the 1730 marriage law with no amendments); see also Perpetual Laws of the Commonwealth of Massachusetts 253 (1788), in The First Laws of the Commonwealth of Massachusetts (J. Cushing ed. 1981). In general, "[p]ost-Revolutionary marriage law assumed that below a certain age, children could . . . no[t] intellectually understand its significance." Grossberg 105.

Indeed, the law imposed age limits on all manner of activities that required judgment and reason. Children

could not vote, could not serve on juries, and generally could not be witnesses in criminal cases unless they were older than 14. See Brewer 43, 145, 148, 159. Nor could they swear loyalty to a State. See, *e.g.,* 9 Pa. Stats. at Large 111 (1903 ed.). Early federal laws granting aliens the ability to become citizens provided that those under 21 were deemed citizens if their fathers chose to naturalize. See, *e.g.,* Act of Mar. 26, 1790, 1 Stat. 104; Act of Jan. 29, 1795, ch. 20, 1 Stat. 415.

## C

The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children. The Puritan tradition in New England laid the foundation of American parental authority and duty. See MacDonald 6 ("The Puritans are virtually the inventors of the family as we know it today"). In the decades leading up to and following the Revolution, the conception of the child's mind evolved but the duty and authority of parents remained. Indeed, society paid closer attention to potential influences on children than before. See Mintz 72 ("By weakening earlier forms of patriarchal authority, the Revolution enhanced the importance of childrearing and education in ensuring social stability"). Teachers and schools came under scrutiny, and children's reading material was carefully supervised. Laws reflected these concerns and often supported parental authority with the coercive power of the state.

## II
### A

In light of this history, the Framers could not possibly have understood "the freedom of speech" to include an unqualified right to speak to minors. Specifically, I am sure that the founding generation would not have under-

stood "the freedom of speech" to include a right to speak to children without going through their parents.  As a consequence, I do not believe that laws limiting such speech— for example, by requiring parental consent to speak to a minor—"abridg[e] the freedom of speech" within the original meaning of the First Amendment.

We have recently noted that this Court does not have "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *Stevens*, 559 U. S., at ___ (slip op., at 9).  But we also recognized that there may be "some categories of speech that have been historically unprotected [and] have not yet been specifically identified or discussed as such in our case law."  *Ibid.*  In my opinion, the historical evidence here plainly reveals one such category.[2]

### B

Admittedly, the original public understanding of a constitutional provision does not always comport with modern sensibilities.  See *Morse*, 551 U. S., at 419 (THOMAS, J., concurring) (treating students "as though it

---

[2] The majority responds that "it does not follow" from the historical evidence "that the state has the power to prevent children from hearing . . . anything *without their parents' prior consent*."  *Ante*, at 7, n. 3.  Such a conclusion, the majority asserts, would lead to laws that, in its view, would be undesirable and "obviously" unconstitutional.  *Ibid.*

The majority's circular argument misses the point.  The question is not whether certain laws might make sense to judges or legislators today, but rather what the public likely understood "the freedom of speech" to mean when the First Amendment was adopted.  See *District of Columbia* v. *Heller*, 554 U. S. 570, 634–635 (2008).  I believe it is clear that the founding public would not have understood "the freedom of speech" to include speech to minor children bypassing their parents.  It follows that the First Amendment imposes no restriction on state regulation of such speech.  To note that there may not be "precedent for [such] state control," *ante*, at 8, n. 3, "is not to establish that [there] is a constitutional right," *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 373 (1995) (SCALIA, J., dissenting).

were still the 19th century would find little support today"). It may also be inconsistent with precedent. See *McDonald*, 561 U. S., at \_\_\_–\_\_\_ (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 48–52) (rejecting the *Slaughter-House Cases*, 16 Wall. 36 (1873), as inconsistent with the original public meaning of the Privileges or Immunities Clause of the Fourteenth Amendment).

This, however, is not such a case. Although much has changed in this country since the Revolution, the notion that parents have authority over their children and that the law can support that authority persists today. For example, at least some States make it a crime to lure or entice a minor away from the minor's parent. See, *e.g.,* Cal. Penal Code Ann. §272(b)(1) (West 2008); Fla. Stat. §787.03 (2010). Every State in the Union still establishes a minimum age for marriage without parental or judicial consent. Cf. *Roper* v. *Simmons*, 543 U. S. 551, 558 (Appendix D to opinion of Court) (2005). Individuals less than 18 years old cannot enlist in the military without parental consent. 10 U. S. C. §505(a). And minors remain subject to curfew laws across the country, see Brief for Louisiana et al. as *Amici Curiae* 16, and cannot unilaterally consent to most medical procedures, *id.,* at 15.

Moreover, there are many things minors today cannot do at all, whether they have parental consent or not. State laws set minimum ages for voting and jury duty. See *Roper*, *supra,* at 581–585 (Appendixes B and C to opinion of Court). In California (the State at issue here), minors cannot drive for hire or drive a school bus, Cal. Veh. Code Ann. §§12515, 12516 (West 2010), purchase tobacco, Cal. Penal Code Ann. §308(b) (West 2008), play bingo for money, §326.5(e), or execute a will, Cal. Probate Code Ann. §6220 (West 2009).

My understanding of "the freedom of speech" is also consistent with this Court's precedents. To be sure, the

Court has held that children are entitled to the protection of the First Amendment, see, *e.g., Erznoznik* v. *Jacksonville*, 422 U. S. 205, 212–213 (1975), and the government may not unilaterally dictate what children can say or hear, see *id.,* at 213–214; *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 511 (1969). But this Court has never held, until today, that "the freedom of speech" includes a right to speak to minors (or a right of minors to access speech) without going through the minors' parents. To the contrary, "[i]t is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults." *Erznoznik, supra,* at 212; cf. *post*, at 3 (BREYER, J., dissenting).

The Court's constitutional jurisprudence "historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." *Parham* v. *J. R.*, 442 U. S. 584, 602 (1979). Under that case law, "legislature[s] [can] properly conclude that parents and others, teachers for example, who have . . . primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg* v. *New York*, 390 U. S. 629, 639 (1968); see also *Bellotti* v. *Baird*, 443 U. S. 622, 635 (1979) (opinion of Powell, J.) ("[T]he State is entitled to adjust its legal system to account for children's vulnerability and their needs for concern, . . . sympathy, and . . . paternal attention" (internal quotation marks omitted)). This is because "the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter." *Id.,* at 638; *id.*, at 638–639 ("Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding").

### III

The California law at issue here prohibits the sale or rental of "violent video game[s]" to minors, defined as anyone "under 18 years of age." Cal. Civ. Code Ann. §§1746.1(a), 1746 (West 2009). A violation of the law is punishable by a civil fine of up to $1,000. §1746.3. Critically, the law does not prohibit adults from buying or renting violent video games for a minor or prohibit minors from playing such games. Cf. *ante*, at 10 (ALITO, J., concurring in judgment); *post*, at 10 (BREYER, J., dissenting). The law also does not restrict a "minor's parent, grandparent, aunt, uncle, or legal guardian" from selling or renting him a violent video game. §1746.1(c).

Respondents, associations of companies in the video game industry, brought a preenforcement challenge to California's law, claiming that on its face the law violates the free speech rights of their members. The Court holds that video games are speech for purposes of the First Amendment and finds the statute facially unconstitutional. See *ante*, at 2–3, 11–17. I disagree.

Under any of this Court's standards for a facial First Amendment challenge, this one must fail. The video game associations cannot show "that no set of circumstances exists under which [the law] would be valid," "that the statute lacks any plainly legitimate sweep," or that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U. S., at ___ (slip op., at 10) (internal quotation marks omitted). Even assuming that video games are speech, in most applications the California law does not implicate the First Amendment. All that the law does is prohibit the direct sale or rental of a violent video game to a minor by someone other than the minor's parent, grandparent, aunt, uncle, or legal guardian. Where a minor has a parent or guardian, as is usually true, the law does not prevent that minor from obtaining a violent video

game with his parent's or guardian's help.  In the typical case, the only speech affected is speech that bypasses a minor's parent or guardian.  Because such speech does not fall within "the freedom of speech" as originally understood, California's law does not ordinarily implicate the First Amendment and is not facially unconstitutional.[3]

\*     \*     \*

"The freedom of speech," as originally understood, does not include a right to speak to minors without going through the minors' parents or guardians.  Therefore, I cannot agree that the statute at issue is facially unconstitutional under the First Amendment.

I respectfully dissent.

———————

[3] Whether the statute would survive an as-applied challenge in the unusual case of an emancipated minor is a question for another day. To decide this case, it is enough that the statute is not unconstitutional on its face.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1448

_____

## EDMUND G. BROWN, JR., GOVERNOR OF CAL- IFORNIA, ET AL., PETITIONERS *v.* ENTERTAIN- MENT MERCHANTS ASSOCIATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 27, 2011]

JUSTICE BREYER, dissenting.

California imposes a civil fine of up to $1,000 upon any person who distributes a violent video game in California without labeling it "18," or who sells or rents a labeled violent video game to a person under the age of 18. Representatives of the video game and software industries, claiming that the statute violates the First Amendment on its face, seek an injunction against its enforcement. Applying traditional First Amendment analysis, I would uphold the statute as constitutional on its face and would consequently reject the industries' facial challenge.

## I
## A

California's statute defines a violent video game as: A game in which a player "kill[s], maim[s], dismember[s], or sexually assault[s] an image of a human being,"
*and*

> "[a] reasonable person, considering the game as a whole, would find [the game] appeals to a deviant or morbid interest of minors,"

*and*

> "[the game] is patently offensive to prevailing standards in the community as to what is suitable for minors,"

*and*

> "the game, as a whole, . . . lack[s] serious literary, artistic, political, or scientific value for minors."  Cal. Civ. Code Ann. §1746(d)(1) (West 2009).

The statute in effect forbids the sale of such a game to minors unless they are accompanied by a parent; it requires the makers of the game to affix a label identifying it as a game suitable only for those aged 18 and over; it exempts retailers from liability unless such a label is properly affixed to the game; and it imposes a civil fine of up to $1,000 upon a violator.  See §§1746.1–1746.3.

## B

A facial challenge to this statute based on the First Amendment can succeed only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States* v. *Stevens*, 559 U. S. __, __  (2010) (slip op., at 10) (internal quotation marks omitted).  Moreover, it is more difficult to mount a facial First Amendment attack on a statute that seeks to regulate activity that involves action as well as speech.  See *Broadrick* v. *Oklahoma*, 413 U. S. 601, 614–615 (1973).  Hence, I shall focus here upon an area within which I believe the State can legitimately apply its statute, namely sales to minors under the age of 17 (the age cutoff used by the industry's own ratings system), of highly realistic violent video games, which a reasonable game maker would know meet the Act's criteria.  That area lies at the heart of the statute.  I shall assume that the number of instances in which the State will enforce the statute within that area is comparatively large, and that the number outside that area (for example, sales to 17-year-olds) is comparatively small.  And the activity the statute regulates combines speech with action (a virtual form of target practice).

C

In determining whether the statute is unconstitutional, I would apply both this Court's "vagueness" precedents and a strict form of First Amendment scrutiny. In doing so, the special First Amendment category I find relevant is not (as the Court claims) the category of "depictions of violence," *ante*, at 8, but rather the category of "protection of children." This Court has held that the "power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Prince* v. *Massachusetts*, 321 U. S. 158, 170 (1944). And the "'regulatio[n] of communication addressed to [children] need not conform to the requirements of the [F]irst [A]mendment in the same way as those applicable to adults.'" *Ginsberg* v. *New York*, 390 U. S. 629, 638, n. 6 (1968) (quoting Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 939 (1963)).

The majority's claim that the California statute, if upheld, would create a "new categor[y] of unprotected speech," *ante*, at 3, 6, is overstated. No one here argues that depictions of violence, even extreme violence, *automatically* fall outside the First Amendment's protective scope as, for example, do obscenity and depictions of child pornography. We properly speak of *categories* of expression that lack protection when, like "child pornography," the category is broad, when it applies automatically, and when the State can prohibit everyone, including adults, from obtaining access to the material within it. But where, as here, careful analysis must precede a narrower judicial conclusion (say, denying protection to a shout of "fire" in a crowded theater, or to an effort to teach a terrorist group how to peacefully petition the United Nations), we do not normally describe the result as creating a "new category of unprotected speech." See *Schenck* v. *United States*, 249 U. S. 47, 52 (1919); *Holder* v. *Humanitarian Law Project*, 561 U. S. __ (2010).

Thus, in *Stevens,* after rejecting the claim that *all* depictions of animal cruelty (a category) fall outside the First Amendment's protective scope, we went on to decide whether the particular statute at issue violates the First Amendment under traditional standards; and we held that, because the statute was overly broad, it was invalid. Similarly, here the issue is whether, applying traditional First Amendment standards, this statute does, or does not, pass muster.

## II

In my view, California's statute provides "fair notice of what is prohibited," and consequently it is not impermissibly vague. *United States* v. *Williams,* 553 U. S. 285, 304 (2008). *Ginsberg* explains why that is so. The Court there considered a New York law that forbade the sale to minors of a

> "picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts nudity . . . ,"

*that*

> "predominately appeals to the prurient, shameful or morbid interest of minors,"

*and*

> "is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors,"

*and*

> "is utterly without redeeming social importance for minors." 390 U. S., at 646–647.

This Court upheld the New York statute in *Ginsberg* (which is sometimes unfortunately confused with a very

different, earlier case, *Ginzburg* v. *United States*, 383 U. S. 463 (1966)). The five-Justice majority, in an opinion written by Justice Brennan, wrote that the statute was sufficiently clear. 390 U. S., at 643–645. No Member of the Court voiced any vagueness objection. See *id.*, at 648–650 (Stewart, J., concurring in result); *id.*, at 650–671 (Douglas, J., joined by Black, J., dissenting); *id.*, at 671–675 (Fortas, J., dissenting).

Comparing the language of California's statute (set forth *supra*, at 1–2) with the language of New York's statute (set forth immediately above), it is difficult to find any vagueness-related difference. Why are the words "kill," "maim," and "dismember" any more difficult to understand than the word "nudity?" JUSTICE ALITO objects that these words do "not perform the narrowing function" that this Court has required in adult obscenity cases, where statutes can only cover "'hard core'" depictions. *Ante*, at 6 (opinion concurring in judgment). But the relevant comparison is not to adult obscenity cases but to *Ginsberg*, which dealt with "nudity," a category no more "narrow" than killing and maiming. And in any event, *narrowness* and *vagueness* do not necessarily have anything to do with one another. All that is required for vagueness purposes is that the terms "kill," "maim," and "dismember" give fair notice as to what they cover, which they do.

The remainder of California's definition copies, almost word for word, the language this Court used in *Miller* v. *California*, 413 U. S. 15 (1973), in permitting a *total ban* on material that satisfied its definition (one enforced with *criminal* penalties). The California law's reliance on "community standards" adheres to *Miller*, and in *Fort Wayne Books, Inc.* v. *Indiana*, 489 U. S. 46, 57–58 (1989), this Court specifically upheld the use of *Miller'*s language against charges of vagueness. California only departed from the *Miller* formulation in two significant respects: It

substituted the word "deviant" for the words "prurient" and "shameful," and it three times added the words "for minors." The word "deviant" differs from "prurient" and "shameful," but it would seem no less suited to defining and narrowing the reach of the statute. And the addition of "for minors" to a version of the *Miller* standard was approved in *Ginsberg*, 390 U. S., at 643, even though the New York law "dr[ew] no distinction between young children and adolescents who are nearing the age of majority," *ante*, at 8 (opinion of ALITO, J.).

Both the *Miller* standard and the law upheld in *Ginsberg* lack perfect clarity. But that fact reflects the difficulty of the Court's long search for words capable of protecting expression without depriving the State of a legitimate constitutional power to regulate. As is well known, at one point Justice Stewart thought he could do no better in defining obscenity than, "I know it when I see it." *Jacobellis* v. *Ohio*, 378 U. S. 184, 197 (1964) (concurring opinion). And Justice Douglas dissented from *Miller*'s standard, which he thought was still too vague. 413 U. S., at 39–40. Ultimately, however, this Court accepted the "community standards" tests used in *Miller* and *Ginsberg*. They reflect the fact that sometimes, even when a precise standard proves elusive, it is easy enough to identify instances that fall within a legitimate regulation. And they seek to draw a line, which, while favoring free expression, will nonetheless permit a legislature to find the words necessary to accomplish a legitimate constitutional objective. Cf. *Williams*, *supra*, at 304 (the Constitution does not always require "'perfect clarity and precise guidance,'" even when "'expressive activity'" is involved).

What, then, is the difference between *Ginsberg* and *Miller* on the one hand and the California law on the other? It will often be easy to pick out cases at which California's statute directly aims, involving, say, a character who shoots out a police officer's knee, douses him with

gasoline, lights him on fire, urinates on his burning body, and finally kills him with a gunshot to the head. (Footage of one such game sequence has been submitted in the record.) See also *ante*, at 14–15 (ALITO, J., concurring in judgment). As in *Miller* and *Ginsberg*, the California law clearly *protects* even the most violent games that possess serious literary, artistic, political, or scientific value. §1746(d)(1)(A)(iii). And it is easier here than in *Miller* or *Ginsberg* to separate the sheep from the goats at the statute's border. That is because here the industry itself has promulgated standards and created a review process, in which adults who "typically have experience with children" assess what games are inappropriate for minors. See Entertainment Software Rating Board, Rating Process, online at http://www.esrb.org/ratings/&ratings\_process.jsp (all Internet materials as visited June 24, 2011, and available in Clerk of Court's case file).

There is, of course, one obvious difference: The *Ginsberg* statute concerned depictions of "nudity," while California's statute concerns extremely violent video games. But for purposes of vagueness, why should that matter? JUSTICE ALITO argues that the *Miller* standard sufficed because there are "certain generally accepted norms concerning expression related to sex," whereas there are no similarly "accepted standards regarding the suitability of violent entertainment." *Ante*, at 7–8. But there is no evidence that is so. The Court relied on "community standards" in *Miller* precisely because of the difficulty of articulating "accepted norms" about depictions of sex. I can find no difference—historical or otherwise—that is *relevant* to the vagueness question. Indeed, the majority's examples of literary descriptions of violence, on which JUSTICE ALITO relies, do not show anything relevant at all.

After all, one can find in literature as many (if not more) descriptions of physical love as descriptions of violence. Indeed, sex "has been a theme in art and literature

throughout the ages." *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 246 (2002). For every Homer, there is a Titian. For every Dante, there is an Ovid. And for all the teenagers who have read the original versions of Grimm's Fairy Tales, I suspect there are those who know the story of Lady Godiva.

Thus, I can find no meaningful vagueness-related differences between California's law and the New York law upheld in *Ginsberg*. And if there remain any vagueness problems, the state courts can cure them through interpretation. See *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 216 (1975) ("[S]tate statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"). Cf. *Ginsberg*, *supra*, at 644 (relying on the fact that New York Court of Appeals would read a knowledge requirement into the statute); *Berry* v. *Santa Barbara*, 40 Cal. App. 4th 1075, 1088–1089, 47 Cal. Rptr. 2d 661, 669 (1995) (reading a knowledge requirement into a statute). Consequently, for purposes of this facial challenge, I would not find the statute unconstitutionally vague.

## III

Video games combine physical action with expression. Were physical activity to predominate in a game, government could appropriately intervene, say by requiring parents to accompany children when playing a game involving actual target practice, or restricting the sale of toys presenting physical dangers to children. See generally Consumer Product Safety Improvement Act of 2008, 122 Stat. 3016 ("Title I—Children's Product Safety"). But because video games also embody important expressive and artistic elements, I agree with the Court that the First Amendment significantly limits the State's power to regulate. And I would determine whether the State has exceeded those limits by applying a strict standard of review.

Like the majority, I believe that the California law must be "narrowly tailored" to further a "compelling interest," without there being a "less restrictive" alternative that would be "at least as effective." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 874, 875, 879 (1997). I would not apply this strict standard "mechanically." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 841 (2000) (BREYER, J., joined by Rehnquist, C. J., and O'Connor and SCALIA, JJ., dissenting). Rather, in applying it, I would evaluate the degree to which the statute injures speech-related interests, the nature of the potentially-justifying "compelling interests," the degree to which the statute furthers that interest, the nature and effectiveness of possible alternatives, and, in light of this evaluation, whether, overall, "the statute works speech-related harm . . . out of proportion to the benefits that the statute seeks to provide." *Ibid.* See also *Burson* v. *Freeman*, 504 U. S. 191, 210 (1992) (plurality opinion) (applying strict scrutiny and finding relevant the lack of a "significant impingement" on speech).

First Amendment standards applied in this way are difficult but not impossible to satisfy. Applying "strict scrutiny" the Court has upheld restrictions on speech that, for example, ban the teaching of peaceful dispute resolution to a group on the State Department's list of terrorist organizations, *Holder*, 561 U. S., at \_\_\_ (slip op., at 22–34); but cf. *id.*, at \_\_\_ (slip op., at 1) (BREYER, J., dissenting), and limit speech near polling places, *Burson*, *supra*, at 210–211 (plurality opinion). And applying less clearly defined but still rigorous standards, the Court has allowed States to require disclosure of petition signers, *Doe* v. *Reed*, 561 U. S. \_\_\_ (2010), and to impose campaign contribution limits that were "'closely drawn' to match a 'sufficiently important interest,'" *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 387–388 (2000).

Moreover, although the Court did not specify the "level

of scrutiny" it applied in *Ginsberg*, we have subsequently described that case as finding a "compelling interest" in protecting children from harm sufficient to justify limitations on speech. See *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989). Since the Court in *Ginsberg* specified that the statute's prohibition applied to material that was *not* obscene, 390 U. S., at 634, I cannot dismiss *Ginsberg* on the ground that it concerned obscenity. But cf. *ante*, at 6 (majority opinion). Nor need I depend upon the fact that the Court in *Ginsberg* insisted only that the legislature have a "rational" basis for finding the depictions there at issue harmful to children. 390 U. S., at 639. For in this case, California has substantiated its claim of harm with considerably stronger evidence.

## A

California's law imposes no more than a modest restriction on expression. The statute prevents no one from playing a video game, it prevents no adult from buying a video game, and it prevents no child or adolescent from obtaining a game provided a parent is willing to help. §1746.1(c). All it prevents is a child or adolescent from buying, without a parent's assistance, a gruesomely violent video game of a kind that the industry *itself* tells us it wants to keep out of the hands of those under the age of 17. See Brief for Respondents 8.

Nor is the statute, if upheld, likely to create a precedent that would adversely affect other media, say films, or videos, or books. A typical video game involves a significant amount of physical activity. See *ante*, at 13–14 (ALITO, J., concurring in judgment) (citing examples of the increasing interactivity of video game controllers). And pushing buttons that achieve an interactive, virtual form of target practice (using images of human beings as targets), while containing an expressive component, is not

just like watching a typical movie. See *infra*, at 14.

## B

The interest that California advances in support of the statute is compelling. As this Court has previously described that interest, it consists of both (1) the "basic" parental claim "to authority in their own household to direct the rearing of their children," which makes it proper to enact "laws designed to aid discharge of [parental] responsibility," and (2) the State's "independent interest in the well-being of its youth." *Ginsberg*, 390 U. S., at 639–640. Cf. *id.*, at 639, n. 7 ("'[O]ne can well distinguish laws which do not impose a morality on children, but which support the right of parents to deal with the morals of their children as they see fit'" (quoting Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum. L. Rev. 391, 413, n. 68 (1963))). And where these interests work in tandem, it is not fatally "underinclusive" for a State to advance its interests in protecting children against the special harms present in an interactive video game medium through a default rule that still allows parents to provide their children with what their parents wish.

Both interests are present here. As to the need to help parents guide their children, the Court noted in 1968 that "'parental control or guidance cannot always be provided.'" 390 U. S., at 640. Today, 5.3 million grade-school-age children of working parents are routinely home alone. See Dept. of Commerce, Census Bureau, Who's Minding the Kids? Child Care Arrangements: Spring 2005/Summer 2006, p. 12 (2010), online at http://www.census.gov/prod/2010pubs/p70-121.pdf. Thus, it has, if anything, become more important to supplement parents' authority to guide their children's development.

As to the State's independent interest, we have pointed out that juveniles are more likely to show a "'lack of ma-

turity'" and are "more vulnerable or susceptible to negative influences and outside pressures," and that their "character . . . is not as well formed as that of an adult." *Roper* v. *Simmons*, 543 U. S. 551, 569–570 (2005). And we have therefore recognized "a compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications*, *supra*, at 126.

At the same time, there is considerable evidence that California's statute significantly furthers this compelling interest. That is, in part, because video games are excellent teaching tools. Learning a practical task often means developing habits, becoming accustomed to performing the task, and receiving positive reinforcement when performing that task well. Video games can help develop habits, accustom the player to performance of the task, and reward the player for performing that task well. Why else would the Armed Forces incorporate video games into its training? See CNN, War Games: Military Training Goes High-Tech (Nov. 22, 2001), online at http://articles.cnn.com/2001–11–2/tech/.war.games_1_ict-bill-swartout-real-world-training?_s=PM:TECH.

When the military uses video games to help soldiers train for missions, it is using this medium for a beneficial purpose. But California argues that when the teaching features of video games are put to less desirable ends, harm can ensue. In particular, extremely violent games can harm children by rewarding them for being violently aggressive in play, and thereby often teaching them to be violently aggressive in life. And video games can cause more harm in this respect than can typically passive media, such as books or films or television programs.

There are many scientific studies that support California's views. Social scientists, for example, have found *causal* evidence that playing these games results in harm. Longitudinal studies, which measure changes over time, have found that increased exposure to violent video games

causes an increase in aggression over the same period. See Möller & Krahé, Exposure to Violent Video Games and Aggression in German Adolescents: A Longitudinal Analysis, 35 Aggressive Behavior 75 (2009); Gentile & Gentile, Violent Video Games as Exemplary Teachers: A Conceptual Analysis, 37 J. Youth & Adolescence 127 (2008); Anderson et al., Longitudinal Effects of Violent Video Games on Aggression in Japan and the United States, 122 Pediatrics e1067 (2008); Wallenius & Puna-mäki, Digital Game Violence and Direct Aggression in Adolescence: A Longitudinal Study of the Roles of Sex, Age, and Parent-Child Communication, 29 J. Applied Developmental Psychology 286 (2008).

Experimental studies in laboratories have found that subjects randomly assigned to play a violent video game subsequently displayed more characteristics of aggression than those who played nonviolent games. See, *e.g.*, Anderson et al., Violent Video Games: Specific Effects of Violent Content on Aggressive Thoughts and Behavior, 36 Advances in Experimental Soc. Psychology 199 (2004).

Surveys of 8th and 9th grade students have found a correlation between playing violent video games and aggression. See, *e.g.*, Gentile, Lynch, Linder, & Walsh, The Effects of Violent Video Game Habits On Adolescent Hostility, Aggressive Behaviors, and School Performance, 27 J. Adolescence 5 (2004).

Cutting-edge neuroscience has shown that "virtual violence in video game playing results in those neural patterns that are considered characteristic for aggressive cognition and behavior." Weber, Ritterfeld, & Mathiak, Does Playing Violent Video Games Induce Aggression? Empirical Evidence of a Functional Magnetic Resonance Imaging Study, 8 Media Psychology 39, 51 (2006).

And "meta-analyses," *i.e.*, studies of all the studies, have concluded that exposure to violent video games "was positively associated with aggressive behavior, aggressive

cognition, and aggressive affect," and that "playing violent video games is a *causal* risk factor for long-term harmful outcomes." Anderson et al., Violent Video Game Effects on Aggression, Empathy, and Prosocial Behavior in Eastern and Western Countries: A Meta-Analytic Review, 136 Psychological Bulletin 151, 167, 169 (2010) (emphasis added).

Some of these studies take care to explain in a common-sense way why video games are potentially more harmful than, say, films or books or television. In essence, they say that the closer a child's behavior comes, not to watching, but to *acting* out horrific violence, the greater the potential psychological harm. See Bushman & Huesmann, Aggression, in 2 Handbook of Social Pscyhology 833, 851 (S. Fiske, D. Gilbert, & G. Lindzey eds., 5th ed. 2010) (video games stimulate more aggression because "[p]eople learn better when they are actively involved," players are "more likely to identify with violent characters," and "violent games directly reward violent behavior"); Polman, de Castro, & van Aken, Experimental Study of the Differential Effects of Playing Versus Watching Violent Video Games on Children's Aggressive Behavior, 34 Aggressive Behavior 256 (2008) (finding greater aggression resulting from playing, as opposed to watching, a violent game); C. Anderson, D. Gentile, & K. Buckley, Violent Video Game Effects on Children and Adolescents 136–137 (2007) (three studies finding greater effects from games as opposed to television). See also *infra*, at 15–16 (statements of expert public health associations agreeing that interactive games can be more harmful than "passive" media like television); *ante*, at 12–17 (ALITO, J., concurring in judgment).

Experts debate the conclusions of all these studies. Like many, perhaps most, studies of human behavior, each study has its critics, and some of those critics have produced studies of their own in which they reach different

conclusions. (I list both sets of research in the appendixes.) I, like most judges, lack the social science expertise to say definitively who is right. But associations of public health professionals who do possess that expertise have reviewed many of these studies and found a significant risk that violent video games, when compared with more passive media, are particularly likely to cause children harm.

Eleven years ago, for example, the American Academy of Pediatrics, the American Academy of Child & Adolescent Psychiatry, the American Psychological Association, the American Medical Association, the American Academy of Family Physicians, and the American Psychiatric Association released a joint statement, which said:

> "[O]ver 1000 studies . . . point overwhelmingly to a causal connection between media violence and aggressive behavior in some children . . . [and, though less research had been done at that time, preliminary studies indicated that] the impact of violent interactive entertainment (video games and other interactive media) on young people . . . may be *significantly more severe* than that wrought by television, movies, or music." Joint Statement on the Impact of Entertainment Violence on Children (2000) (emphasis added), online at http://www.aap.org/advocacy/releases/jstmtevc.htm.

Five years later, after more research had been done, the American Psychological Association adopted a resolution that said:

> "[C]omprehensive analysis of violent interactive video game research suggests such exposure . . . increases aggressive behavior, . . . increases aggressive thoughts, . . . increases angry feelings, . . . decreases helpful behavior, and . . . increases physiological arousal." Resolution on Violence in Video Games and Interactive Media (2005), online at

http://www.apa.org/about/governance/council/policy/ interactive-media.pdf.

The Association added:

> "[T]he practice, repetition, and rewards for acts of violence may be *more conducive* to increasing aggressive behavior among children and youth than passively watching violence on TV and in films." *Ibid.* (emphasis added).

Four years after that, in 2009, the American Academy of Pediatrics issued a statement in significant part about interactive media.  It said:

> "Studies of these rapidly growing and ever-more-sophisticated types of media have indicated that the effects of child-initiated virtual violence may be *even more profound than those of passive media* such as television. In many games the child or teenager is 'embedded' in the game and uses a 'joystick' (handheld controller) that enhances both the experience and the aggressive feelings."  Policy Statement—Media Violence, 124 Pediatrics 1495, 1498 (2009) (emphasis added).

It added:

> "Correlational and experimental studies have revealed that violent video games lead to increases in aggressive behavior and aggressive thinking and decreases in prosocial behavior. Recent longitudinal studies . . . have revealed that in as little as 3 months, high exposure to violent video games increased physical aggression. Other recent longitudinal studies . . . have revealed similar effects across 2 years."  *Ibid.* (footnotes omitted).

Unlike the majority, I would find sufficient grounds in these studies and expert opinions for this Court to defer to

an elected legislature's conclusion that the video games in question are particularly likely to harm children. This Court has always thought it owed an elected legislature some degree of deference in respect to legislative facts of this kind, particularly when they involve technical matters that are beyond our competence, and even in First Amendment cases. See *Holder*, 561 U. S., at \_\_\_ (slip op., at 28–29) (deferring, while applying strict scrutiny, to the Government's national security judgments); *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 195–196 (1997) (deferring, while applying intermediate scrutiny, to the Government's technological judgments). The majority, in reaching its own, opposite conclusion about the validity of the relevant studies, grants the legislature no deference at all. Compare *ante*, at 12–13 (stating that the studies do not provide evidence that violent video games "cause" harm (emphasis deleted)), with *supra*, at 12–13 (citing longitudinal studies finding causation).

C

I can find no "less restrictive" alternative to California's law that would be "at least as effective." See *Reno*, 521 U. S., at 874. The majority points to a voluntary alternative: The industry tries to prevent those under 17 from buying extremely violent games by labeling those games with an "M" (Mature) and encouraging retailers to restrict their sales to those 17 and older. See *ante*, at 15–16. But this voluntary system has serious enforcement gaps. When California enacted its law, a Federal Trade Commission (FTC) study had found that nearly 70% of unaccompanied 13- to 16-year-olds were able to buy M-rated video games. FTC, Marketing Violent Entertainment to Children 27 (2004), online at http://www.ftc.gov/os/2004/ 07/040708kidsviolencerpt.pdf. Subsequently the voluntary program has become more effective. But as of the FTC's most recent update to Congress, 20% of those

under 17 are still able to buy M-rated video games, and, breaking down sales by store, one finds that this number rises to nearly 50% in the case of one large national chain.  FTC, Marketing Violent Entertainment to Children 28 (2009), online at http://www.ftc.gov/os/2009/12/ P994511violententertainment.pdf.  And the industry could easily revert back to the substantial noncompliance that existed in 2004, particularly after today's broad ruling reduces the industry's incentive to police itself.

The industry also argues for an alternative technological solution, namely "filtering at the console level."  Brief for Respondents 53.  But it takes only a quick search of the Internet to find guides explaining how to circumvent any such technological controls.  YouTube viewers, for example, have watched one of those guides (called "How to bypass parental controls on the Xbox 360") more than 47,000 times.  See http://www.youtube.com/watch?v= CFlVfVmvN6k.

IV

The upshot is that California's statute, as applied to its heartland of applications (*i.e.,* buyers under 17; extremely violent, realistic video games), imposes a restriction on speech that is modest at most.  That restriction is justified by a compelling interest (supplementing parents' efforts to prevent their children from purchasing potentially harmful violent, interactive material).  And there is no equally effective, less restrictive alternative.  California's statute is consequently constitutional on its face—though litigants remain free to challenge the statute as applied in particular instances, including any effort by the State to apply it to minors aged 17.

I add that the majority's different conclusion creates a serious anomaly in First Amendment law.  *Ginsberg* makes clear that a State can prohibit the sale to minors of depictions of nudity; today the Court makes clear that a

State cannot prohibit the sale to minors of the most violent interactive video games.  But what sense does it make to forbid selling to a 13-year-old boy a magazine with an image of a nude woman, while protecting a sale to that 13-year-old of an interactive video game in which he actively, but virtually, binds and gags the woman, then tortures and kills her?  What kind of First Amendment would permit the government to protect children by restricting sales of that extremely violent video game *only* when the woman—bound, gagged, tortured, and killed—is also topless?

This anomaly is not compelled by the First Amendment. It disappears once one recognizes that extreme violence, where interactive, and *without literary, artistic, or similar justification*, can prove at least as, if not more, harmful to children as photographs of nudity.  And the record here is more than adequate to support such a view.  That is why I believe that *Ginsberg* controls the outcome here *a fortiori.* And it is why I believe California's law is constitutional on its face.

This case is ultimately less about censorship than it is about education.  Our Constitution cannot succeed in securing the liberties it seeks to protect unless we can raise future generations committed cooperatively to making our system of government work.  Education, however, is about choices.  Sometimes, children need to learn by making choices for themselves.  Other times, choices are made for children—by their parents, by their teachers, and by the people acting democratically through their governments.  In my view, the First Amendment does not disable government from helping parents make such a choice here—a choice not to have their children buy extremely violent, interactive video games, which they more than reasonably fear pose only the risk of harm to those children.

For these reasons, I respectfully dissent.

APPENDIXES

With the assistance of the Supreme Court Library, I have compiled these two appendixes listing peer-reviewed academic journal articles on the topic of psychological harm resulting from playing violent video games. The library conducted a search for relevant articles on the following databases: PsycINFO, PubMed, Academic Search Premier, ArticleFirst (OCLC), and Dialog (files 1, 7, 34, 98, 121, 142, 144, 149). The following search terms were used: "(video* or computer or arcade or online) and (game*) and (attack* or fight* or aggress* or violen* or hostil* or ang* or arous* or prosocial or help* or desens* or empathy)." After eliminating irrelevant matches based on title or abstract, I categorized these articles as either supporting the hypothesis that violent video games are harmful (listed in Appendix A), or not supporting/rejecting the hypothesis that violent video games are harmful (listed in Appendix B).

Many, but not all, of these articles were available to the California Legislature or the parties in briefing this case. I list them because they suggest that there is substantial (though controverted) evidence supporting the expert associations of public health professionals that have concluded that violent video games can *cause* children psychological harm. See *supra*, at 15–16. And consequently, these studies help to substantiate the validity of the original judgment of the California Legislature, as well as that judgment's continuing validity.

A

Anderson & Bushman, Effects of Violent Video Games on Aggressive Behavior, Aggressive Cognition, Aggressive Affect, Physiological Arousal, and Prosocial Behavior: A Meta-Analytic Review of the Scientific Literature, 12 Psychological Science: J. Am. Psychological Society 353

Appendix A to the opinion of BREYER, J.

(2001).

Anderson & Dill, Video Games and Aggressive Thoughts, Feelings, & Behavior in the Laboratory and in Life, 78 J. Personality & Soc. Psychology 772 (2000).

Anderson et al., Violent Video Games: Specific Effects of Violent Content on Aggressive Thoughts and Behavior, 36 Advances in Experimental Soc. Psychology 199 (2004).

Anderson & Ford, Affect of the Game Player: Short-Term Effects of Highly and Mildly Aggressive Video Games, 12 Personality & Soc. Psychology Bull. 390 (1986).

Anderson & Morrow, Competitive Aggression Without Interaction: Effects of Competitive Versus Cooperative Instructions on Aggressive Behavior in Video Games, 21 Personality & Soc. Psychology Bull. 1020 (1995).

Anderson et al., Longitudinal Effects of Violent Video Games on Aggression in Japan and the United States, 122 Pediatrics e1067 (2008).

Anderson et al., Violent Video Game Effects on Aggression, Empathy, and Prosocial Behavior in Eastern and Western Countries: A Meta-Analytic Review, 136 Psychological Bull. 151 (2010).

Anderson, An Update on the Effects of Playing Violent Video Games, 27 J. Adolescence 113 (2004).

Anderson et al., The Influence of Media Violence on Youth, 4 Psychological Science in the Public Interest 81 (2003).

Anderson & Carnagey, Causal Effects of Violent Sports Video Games on Aggression: Is it Competitiveness or Violent Content? 45 J. Experimental Soc. Psychology 731 (2009).

Anderson & Murphy, Violent Video Games and Aggressive Behavior in Young Women, 29 Aggressive Behavior 423 (2003).

Arriaga, Esteves, Carneiro, & Monteiro, Violent Computer Games and Their Effects on State Hostility and Physiological Arousal, 32 Aggressive Behavior 358 (2006).

Appendix A to the opinion of BREYER, J.

Arriaga, Esteves, Carneiro, & Monteiro, Are the Effects of Unreal Violent Video Games Pronounced When Playing With a Virtual Reality System? 34 Aggressive Behavior 521 (2008).

Baldaro et al., Aggressive and Non-Violent Videogames: Short-Term Psychological and Cardiovascular Effects on Habitual Players, 20 Stress & Health: J. Int'l Society for Investigation of Stress 203 (2004).

Ballard, Hamby, Panee, & Nivens, Repeated Exposure to Video Game Play Results in Decreased Blood Pressure Responding, 8 Media Psychology 323 (2006).

Ballard & Lineberger, Video Game Violence and Confederate Gender: Effects on Reward and Punishment Given by College Males, 41 Sex Roles 541 (1999).

Ballard & Wiest, Mortal Kombat (tm): The Effects of Violent Videogame Play on Males' Hostility and Cardiovascular Responding, 26 J. Applied Soc. Psychology 717 (1996).

Barlett, Branch, Rodeheffer, & Harris, How Long do the Short-Term Violent Video Game Effects Last? 35 Aggressive Behavior 225 (2009).

Barlett, Rodeheffer, Baldassaro, Hinkin, & Harris, The Effect of Advances in Video Game Technology and Content on Aggressive Cognitions, Hostility, and Heart Rate, 11 Media Psychology 540 (2008).

Barlett, Harris, & Baldassaro, Longer You Play, the More Hostile You Feel: Examination of First Person Shooter Video Games and Aggression During Video Game Play, 33 Aggressive Behavior 486 (2007).

Barlett, Harris, & Bruey, The Effect of the Amount of Blood in a Violent Video Game on Aggression, Hostility, and Arousal, 44 J. Experimental Soc. Psychology 539 (2008).

Barlett & Rodeheffer, Effects of Realism on Extended Violent and Nonviolent Video Game Play on Aggressive Thoughts, Feelings, and Physiological Arousal, 35 Ag-

gressive Behavior 213 (2009).

Barlett, Anderson, & Swing, Video Game Effects—Confirmed, Suspected, and Speculative: A Review of the Evidence, 40 Simulation & Gaming 377 (2009).

Bartholow, Sestir, & Davis, Correlates and Consequences of Exposure to Video Game Violence: Hostile Personality, Empathy, and Aggressive Behavior, 31 Personality & Soc. Psychology Bull. 1573 (2005).

Bartholow & Anderson, Effects of Violent Video Games on Aggressive Behavior: Potential Sex Differences, 38 J. Experimental Soc. Psychology 283 (2002).

Bartholow, Bushman, & Sestir, Chronic Violent Video Game Exposure and Desensitization to Violence: Behavioral and Event-Related Brain Potential Data, 42 J. Experimental Soc. Psychology 532 (2006).

Bluemke, Friedrich, & Zumbach, The Influence of Violent and Nonviolent Computer Games on Implicit Measures of Aggressiveness, 36 Aggressive Behavior 1 (2010).

Brady & Matthews, Effects of Media Violence on Health-Related Outcomes Among Young Men, 160 Archives of Pediatrics & Adolescent Med. 341 (2006).

Browne & Hamilton-Giachritsis, The Influence of Violent Media on Children and Adolescents: A Public-Health Approach, 365 Lancet 702 (2005).

Bushman & Anderson, Violent Video Games and Hostile Expectations: A Test of the General Aggression Model, 28 Personality & Soc. Psychology Bull. 1679 (2002).

Bushman & Anderson, Comfortably Numb: Desensitizing Effects of Violent Media on Helping Others, 20 Psychological Science: J. Am. Psychological Society 273 (2009).

Bushman, Rothstein, & Anderson, Much Ado About Something: Violent Video Game Effects and a School of Red Herring: Reply to Ferguson and Kilburn, 136 Psychological Bull. 182 (2010).

Calvert & Tan, Impact of Virtual Reality on Young Adults' Physiological Arousal and Aggressive Thoughts: Interac-

tion Versus Observation, 15 J. Applied Developmental Psychology 125 (1994).

Carnagey, Anderson, & Bartholow, Media Violence and Social Neuroscience: New Questions and New Opportunities, 16 Current Directions in Psychological Science 178 (2007).

Carnagey & Anderson, Violent Video Game Exposure and Aggression: A Literature Review, 45 Minerva Psichiatrica 1 (2004).

Carnagey & Anderson, The Effects of Reward and Punishment in Violent Video Games on Aggressive Affect, Cognition, and Behavior, 16 Psychological Science: J. Am. Psychological Society 882 (2005).

Carnagey, Anderson, & Bushman, The Effect of Video Game Violence on Physiological Desensitization to Real-life Violence, 43 J. Experimental Soc. Psychology 489 (2007).

Chambers & Ascione, The Effects of Prosocial and Aggressive Videogames on Children's Donating and Helping, 148 J. Genetic Psychology: Research and Theory on Human Development 499 (1987).

Chory & Cicchirillo, The Relationship Between Video Game Play and Trait Verbal Aggressiveness: An Application of the General Aggression Model, 24 Communications Research Reports 113 (2007).

Cicchirillo & Chory-Assad, Effects of Affective Orientation and Video Game Play on Aggressive Thoughts and Behaviors, 49 J. Broadcasting & Electronic Media 435 (2005).

Colwell & Payne, Negative Correlates of Computer Game Play in Adolescents, 91 British J. Psychology 295 (2000).

Cooper & Mackie, Video Games and Aggression in Children, 16 J. Applied Soc. Psychology 726 (1986).

Deselms & Altman, Immediate and Prolonged Effects of Videogame Violence, 33 J. Applied Soc. Psychology 1553 (2003).

Appendix A to the opinion of BREYER, J.

Dill & Dill, Video Game Violence: A Review of the Empirical Literature, 3 Aggression & Violent Behavior 407 (1998).

Doğan, Video Games and Children: Violence in Video Games, 44 Yeni Symposium 161 (2006).

Eastin, Video Game Violence and the Female Game Player: Self- and Opponent Gender Effects on Presence and Aggressive Thoughts, 32 Human Communication Research 351 (2006).

Emes, Is Mr Pac Man Eating Our Children? A Review of the Effect of Video Games on Children, 42 Canadian J. Psychiatry 409 (1997).

Farrar, Krcmar, & Nowak, Contextual Features of Violent Video Games, Mental Models, and Aggression, 56 J. Communication 387 (2006).

Fischer, Kastenmüller, & Greitemeyer, Media Violence and the Self: The Impact of Personalized Gaming Characters in Aggressive Video Games on Aggressive Behavior, 46 J. Experimental Soc. Psychology 192 (2010).

Funk, Children's Exposure to Violent Video Games and Desensitization to Violence, 14 Child & Adolescent Psychiatric Clinics North Am. 387 (2005).

Funk, Video Games, 16 Adolescent Med. Clinics 395 (2005).

Funk, Baldacci, Pasold, & Baumgardner, Violence Exposure in Real-Life, Video Games, Television, Movies, and the Internet: Is There Desensitization? 27 J. Adolescence 23 (2004).

Funk, Buchman, Jenks, & Bechtoldt, Playing Violent Video Games, Desensitization, and Moral Evaluation in Children, 24 J. Applied Developmental Psychology 413 (2003).

Funk et al., Aggression and Psychopathology in Adolescents with a Preference for Violent Electronic Games, 28 Aggressive Behavior 134 (2002).

Funk, Buchman, Jenks, & Bechtoldt, An Evidence-Based

Approach to Examining the Impact of Playing Violent Video and Computer Games, SIMILE: Studies in Media & Information Literacy Educ., vol. 2, no. 4, p. 1 (Nov. 2002).

Gentile & Stone, Violent Video Game Effects on Children and Adolescents: A Review of the Literature, 57 Minerva Pediatrica 337 (2005).

Gentile et al., The Effects of Prosocial Video Games on Prosocial Behaviors: International Evidence From Correlational, Longitudinal, and Experimental Studies, 35 Personality & Soc. Psychology Bull. 752 (2009).

Gentile, Lynch, Linder, & Walsh, The Effects of Violent Video Game Habits on Adolescent Hostility, Aggressive Behaviors, and School Performance, 27 J. Adolescence 5 (2004).

Gentile & Gentile, Violent Video Games as Exemplary Teachers: A Conceptual Analysis, 37 J. Youth & Adolescence 127 (2008).

Giumetti & Markey, Violent Video Games and Anger as Predictors of Aggression, 41 J. Research in Personality 1234 (2007).

Graybill, Kirsch, & Esselman, Effects of Playing Violent Versus Nonviolent Video Games on the Aggressive Ideation of Aggressive and Nonaggressive Children, 15 Child Study J. 199 (1985).

Grigoryan, Stepanyan, Stepanyan, & Agababyan, Influence of Aggressive Computer Games on the Brain Cortex Activity Level in Adolescents, 33 Human Physiology 34 (2007).

Hastings et al., Young Children's Video/Computer Game Use: Relations With School Performance and Behavior, 30 Issues in Mental Health Nursing 638 (2009).

Huesmann, Nailing the Coffin Shut on Doubts That Violent Video Games Stimulate Aggression: Comment on Anderson et al., 136 Psychological Bull. 179 (2010).

Huesmann, The Impact of Electronic Media Violence:

Scientific Theory and Research, 41 J. Adolescent Health S6 (2007).

Huesmann & Taylor, The Role of Media Violence in Violent Behavior, 27 Annual Rev. Public Health 393 (2006).

Hummer et al., Short-Term Violent Video Game Play by Adolescents Alters Prefrontal Activity During Cognitive Inhibition, 13 Media Psychology 136 (2010).

Irwin & Gross, Cognitive Temp, Violent Video Games, and Aggressive Behavior in Young Boys, 10 J. Family Violence 337 (1995).

Kirsh & Mounts, Violent Video Game Play impacts Facial Emotion Recognition, 33 Aggressive Behavior 353 (2007).

Kirsh, Mounts, & Olczak, Violent Media Consumption and the Recognition of Dynamic Facial Expressions, 21 J. Interpersonal Violence 571 (2006).

Kirsh, Olczak, & Mounts, Violent Video Games Induce an Affect Processing Bias, 7 Media Psychology 239 (2005).

Kirsh, The Effects of Violent Video Games on Adolescents: The Overlooked Influence of Development, 8 Aggression & Violent Behavior 377 (2003).

Kirsh, Seeing the World Through Mortal Kombat-Colored Glasses: Violent Video Games and the Development of a Short-term Hostile Attribution Bias, 5 Childhood 177 (1998).

Konijn, Bijvank, & Bushman, I Wish I Were a Warrior: The Role of Wishful Identification in the Effects of Violent Video Games on Aggression in Adolescent Boys, 43 Developmental Psychology 1038 (2007).

Krahé & Möller, Playing Violent Electronic Games, Hostile Attributional Style, and Aggression-related Norms in German Adolescents, 27 J. Adolescence 53 (2004).

Krcmar, Farrar, & McGloin, The Effects of Video Game Realism on Attention, Retention and Aggressive Outcomes, 27 Computers in Human Behavior 432 (2011).

Krcmar & Lachlan, Aggressive Outcomes and Videogame

Play: The Role of Length of Play and the Mechanisms at Work, 12 Media Psychology 249 (2009).

Krcmar & Farrar, Retaliatory Aggression and the Effects of Point of View and Blood in Violent Video Games, 12 Mass Communication & Society 115 (2009).

Kronenberger et al., Media Violence Exposure in Aggressive and Control Adolescents: Differences in Self- and Parent-Reported Exposure to Violence on Television and in Video Games, 31 Aggressive Behavior 201 (2005).

Kronenberger et al., Media Violence Exposure and Executive Functioning in Aggressive and Control Adolescents, 61 J. Clinical Psychology 725 (2005).

Kuntsche, Hostility Among Adolescents in Switzerland? Multivariate Relations Between Excessive Media Use and Forms of Violence, 34 J. Adolescent Health 230 (2004).

Lee, Peng, & Klein, Will the Experience of Playing a Violent Role in a Video Game Influence People's Judgments of Violent Crimes? 26 Computers in Human Behavior 1019 (2010).

Lemmens & Bushman, The Appeal of Violent Video Games to Lower Educated Aggressive Adolescent Boys From Two Countries, 9 CyberPsychology & Behavior 638 (2006).

Mathiak & Weber, Toward Brain Correlates of Natural Behavior: fMRI During VIolent Video Games, 27 Human Brain Mapping 948 (2006).

Möller & Krahé, Exposure to Violent Video Games and Aggression in German Adolescents: A Longitudinal Analysis, 35 Aggressive Behavior 75 (2009).

Nowak, Krcmar, & Farrar, The Causes and Consequences of Presence: Considering the Influence of Violent Video Games on Presence and Aggression, 17 Presence: Teleoperators & Virtual Environments 256 (2008).

Olson et al., M-Rated Video Games and Aggressive or Problem Behavior Among Young Adolescents, 13 Applied

Appendix A to the opinion of BREYER, J.

Developmental Science 188 (2009).

Panee & Ballard, High Versus Low Aggressive Priming During Video-Game Training: Effects on Violent Action During Game Play, Hostility, Heart Rate, and Blood Pressure, 32 J. Applied Soc. Psychology 2458 (2002).

Persky & Blascovich, Immersive Virtual Environments Versus Traditional Platforms: Effects of Violent and Nonviolent Video Game Play, 10 Media Psychology 135 (2007).

Persky & Blascovich, Immersive Virtual Video Game Play and Presence: Influences on Aggressive Feelings and Behavior, 17 Presence: Teleoperators & Virtual Environments 57 (2008).

Polman, de Castro, & van Aken, Experimental Study of the Differential Effects of Playing Versus Watching Violent Video Games on Children's Aggressive Behavior, 34 Aggressive Behavior 256 (2008).

Potera, Sex and Violence in the Media Influence Teen Behavior: Three Studies Show a Correlation, 109 American J. Nursing 20 (2009).

Richmond & Wilson, Are Graphic Media Violence, Aggression, and Moral Disengagement Related? 15 Psychiatry, Psychology & Law 350 (2008).

Schaefer & Harrison, The Effects of Violent Fantasy on Children's Aggressive Behavior, 41 Psychology & Educ. 35 (2004).

Schmierbach, "Killing Spree": Exploring the Connection Between Competitive Game Play and Aggressive Cognition, 37 Communication Research 256 (2010).

Sheese & Graziano, Deciding to Defect: The Effects of Video-Game Violence on Cooperative Behavior, 16 Psychological Science: J. Am. Psychological Society 354 (2005).

Sherry, The Effects of Violent Video Games on Aggression. A Meta-Analysis, 27 Human Communication Research 409 (2001).

Shibuya, Sakamoto, Ihori, & Yukawa, The Effects of the Presence and Contexts of Video Game Violence on Children: A Longitudinal Study in Japan, 39 Simulation & Gaming 528 (2008).

Sigurdsson, Gudjonsson, Bragason, Kristjansdottir, & Sigfusdottir, The Role of Violent Cognition in the Relationship Between Personality and the Involvement in Violent Films and Computer Games, 41 Personality & Individual Differences 381 (2006).

Silvern & Williamson, The Effects of Video Game Play on Young Children's Aggression, Fantasy, and Prosocial behavior, 8 J. Applied Developmental Psychology 453 (1987).

Slater, Henry, Swaim, & Cardador, Vulnerable Teens, Vulnerable Times: How Sensation Seeking, Alienation, and Victimization Moderate the Violent Media Content—Aggressiveness Relation, 31 Communication Research 642 (2004).

Slater, Henry, Swaim, & Anderson, Violent Media Content and Aggressiveness in Adolescents: A Downward Spiral Model, 30 Communication Research 713 (2003).

Staude-Müller, Bliesener, & Luthman, Hostile and Hardened? An Experimental Study on (De-)sensitization to Violence and Suffering Through Playing Video Games, 67 Swiss J. Psychology 41 (2008).

Steward & Follina, Informing Policies in Forensic Settings: A Review of Research Investigating the Effects of Exposure to Media Violence on Challenging/Offending Behaviour, 8 British J. Forensic Prac. 31 (2006).

Swing & Anderson, The Unintended Negative Consequences of Exposure to Violent Video games, 12 Int. J. Cognitive Tech. 3 (2007).

Tamborini et al., Violent Virtual Video Games and Hostile Thoughts, 48 J. Broadcasting & Electronic Media 335 (2004).

Uhlmann & Swanson, Exposure to Violent Video Games

Appendix A to the opinion of BREYER, J.

Increases Automatic Aggressiveness, 27 J. Adolescence 41 (2004).

Vaughan, Inadvertent Script Change and Increased Propensity for Violence: The Danger of Interactive Video Games, 34 Transactional Analysis J. 30 (2004).

Wallenius & Punamäki, Digital Game Violence and Direct Aggression in Adolescence: A Longitudinal Study of the Roles of Sex, Age, and Parent-Child Communication, 29 J. Applied Developmental Psychology 286 (2008).

Wallenius, Punamäki, & Rimpelä, Digital Game Playing and Direct and Indirect Aggression in Early Adolescence: The Roles of Age, Social Intelligence, and Parent-Child Communication, 36 J. Youth and Adolescence 325 (2007).

Wang et al., Short Term Exposure to a Violent Video Game Induces Changes in Frontolimbic Circuitry in Adolescents, 3 Brain Imaging & Behavior 38 (2009).

Weber, Ritterfeld, & Mathiak, Does Playing Violent Video Games Induce Aggression? Empirical Evidence of a Functional Magnetic Resonance Imaging Study, 8 Media Psychology 39 (2006).

Wiegman & van Schie, Video Game Playing and its Relations With Aggressive and Prosocial Behaviour, 37 British J. Soc. Psychology 367 (1998).

Williams, The Effects of Frustration, Violence, and Trait Hostility After Playing a Video Game, 12 Mass Communication & Society 291 (2009).

Ybarra et al., Linkages Between Internet and Other Media Violence With Seriously Violent Behavior by Youth, 122 Pediatrics 929 (2008).

## B

Bensley & Van Eenwyk, Video Games and Real-Life Aggression: Review of the Literature, 29 J. Adolescent Health 244 (2001).

Bösche, Violent Content Enhances Video Game Performance, 21 J. Media Psychology: Theories, Methods, and Applications 145 (2009).

Colwell & Kato, Video Game Play in British and Japanese Adolescents, 36 Simulation & Gaming 518 (2005).

Colwell & Kato, Investigation of the Relationship Between Social Isolation, Self-Esteem, Aggression and Computer Game Play in Japanese Adolescents, 6 Asian J. Soc. Psychology 149 (2003).

Dominick, Videogames, Television Violence, and Aggression in Teenagers, 34 J. Communication 136 (1984).

Ferguson, Blazing Angels or Resident Evil? Can Violent Video Games be a Force For Good? 14 Rev. Gen. Psychology 68 (2010).

Ferguson, Violent Video Games: Dogma, Fear, Pseudoscience, 33 Skeptical Inquirer 38 (2009).

Ferguson, The Good, The Bad and the Ugly: A Meta-analytic Review of Positive and Negative Effects of Violent Video Games, 78 Psychiatric Q. 309 (2007).

Ferguson & Meehan, Saturday Night's Alright for Fighting: Antisocial Traits, Fighting, and Weapons Carrying in a Large Sample of Youth, 81 Psychiatric Q. 293 (2010).

Ferguson et al., Violent Video Games and Aggression, 35 Crim. Justice & Behavior 311 (2008).

Ferguson, Research on the Effects of Violent Video Games: A Critical Analysis, 3 Soc. & Personality Psychology Compass 351 (2009).

Ferguson & Rueda, The Hitman Study: Violent Video Game Exposure Effects on Aggressive Behavior, Hostile Feelings, and Depression, 15 European Psychologist 99 (2010).

Appendix B to the opinion of BREYER, J.

Ferguson, San Miguel, & Hartley, A Multivariate Analysis of Youth Violence and Aggression: The Influence of Family, Peers, Depression, and Media Violence, 155 J. Pediatrics 904 (2009).

Ferguson, Evidence for Publication Bias in Video Game Violence Effects Literature: A Meta-Analytic Review, 12 Aggression & Violent Behavior 470 (2007).

Ferguson, The School Shooting/Violent Video Game Link: Causal Relationship or Moral Panic? 5 J. Investigative Psychology & Offender Profiling 25 (2008).

Ferguson et al., Personality, Parental, and Media Influences on Aggressive Personality and Violent Crime in Young Adults, 17 J. Aggression, Maltreatment & Trauma 395 (2008).

Ferguson & Kilburn, Much Ado About Nothing: The Misestimation and Overinterpretation of Violent Video Game Effects in Eastern and Western Nations: Comment on Anderson et al. (2010), 136 Psychological Bull. 174 (2010).

Fleming & Rickwood, Effects of Violent Versus Nonviolent Video Games on Children's Arousal, Aggressive Mood, and Positive Mood, 31 J. Applied Soc. Psychology 2047 (2001).

Griffiths, Violent Video Games and Aggression: A Review of the Literature, 4 Aggression & Violent Behavior 203 (1999).

Griffiths, Video Games and Aggression, 10 The Psychologist 397 (1997).

Ivory & Kalyanaraman, The Effects of Technological Advancement and Violent Content in Video Games on Players' Feelings of Presence, Involvement, Physiological Arousal, and Aggression, 57 J. Communication 532 (2007).

Kestenbaum & Weinstein, Personality, Psychopathology, and Developmental Issues in Male Adolescent Video Game Use, 24 J. Am. Academy Child Psychology 329 (1985).

Markey & Markey, Vulnerability to Violent Video Games: A Review and Integration of Personality Research, 14 Rev. Gen. Psychology 82 (2010).

Markey & Scherer, An Examination of Psychoticism and Motion Capture Controls as Moderators of the Effects of Violent Video Games, 25 Computers in Human Behavior 407 (2009).

Mitrofan, Paul, & Spencer, Is Aggression in Children With Behavioural and Emotional Difficulties Associated With Television Viewing and Video Game Playing? A Systematic Review, 35 Child: Care, Health & Development 5 (2009).

Olson, Media Violence Research and Youth Violence Data: Why Do They Conflict? 28 Academic Psychiatry 144 (2004).

Porter & Starcevic, Are Violent Video Games Harmful? 15 Australasian Psychiatry 422 (2007).

Regenbogen, Herrmann, & Fehr, The Neural Processing of Voluntary Completed, Real and Virtual Violent and NonViolent Computer Game Scenarios Displaying Predefined Actions in Gamers and Nongamers, 5 Soc. Neuroscience 221 (2010).

Scott, The Effect of Video Games on Feelings of Aggression, 129 J. Psychology 121 (1995).

Sestir & Bartholow, Violent and Nonviolent Video Games Produce Opposing Effects on Aggressive and Prosocial Outcomes, 46 J. Experimental Soc. Psychology 934 (2010).

Unsworth, Devilly, & Ward, The Effect of Playing Violent Video Games on Adolescents: Should Parents be Quaking in Their Boots? 13 Psychology, Crime & Law 383 (2007).

Unsworth & Ward, Video Games and Aggressive Behavior. 36 Australian Psychologist 184 (2001).

Williams & Skoric, Internet Fantasy Violence: A Test of Aggression in an Online Game, 72 Communication

Appendix B to the opinion of BREYER, J.

Monographs 217 (2005).

Winkel, Novak, & Hopson, Personality Factors, Subject Gender, and the Effects of Aggressive Video Games on Aggression in Adolescents, 21 J. Research in Personality 211 (1987).